## THE COLUMBIA.

### SHORT et al. v. THE COLUMBIA et al.

(Circuit Court of Appeals, Ninth Circuit. February 10, 1896.)

No. 172.

1. ADMIRALTY—LIMITATION OF LIABILITY—APPEAL—PARTIES.

When two or more parties, having distinct and several claims against the owners of a vessel, are brought into one proceeding for the limitation of the shipowner's liability, or his exemption from liability, pursuant to Rev. St. §§ 4282–4290 and admiralty rules 54–57, the decree in such proceeding, awarding different sums to the different claimants, is several as to them, and any of such claimants may appeal from such decree, without making the others parties to the appeal, or notifying them thereof. McKenna, Circuit Judge, dissenting. 15 C. C. A. 91, 67 Fed. 942, reversed.

2. SAME—TUG AND TOW.

When the owner of a barge which has no motive power undertakes to transport freight by means of the barge, such barge and a tug, belonging to the same owner, by which the motive power is supplied, become one vessel for the purposes of the voyage, and the owner is not entitled to limit his liability, under Rev. St. §§ 4282–4290, for damages caused by the negligence of the crew of either craft, without surrendering both.

Appeal from the District Court of the United States for the District of Oregon.

This was a petition by the Oregon Railway & Navigation Company and the Oregon Short Line & Utah Northern Railway Company for a limitation of liability in respect to damages occasioned by the wrecking of the barge Columbia. Various parties filed claims for damages, and the district court rendered a decree limiting the liability of the owners to the amount of $100. From this decree some of the parties took an appeal, which, on May 6, 1895, on motion of the appellees, was dismissed. See 15 C. C. A. 91, 67 Fed. 942. Afterwards a rehearing was granted, and the motion to dismiss has again been argued.

Page, Eells & Wheeler and Andros & Frank, for appellants.

W. W. Cotton, for appellees.

Before McKENNA, GILBERT, and ROSS, Circuit Judges.

ROSS, Circuit Judge. The motion to dismiss the appeal is first to be disposed of. The contention in support of this motion, which was sustained by this court on the former hearing of this cause, is based upon the theory that the decree entered in the court below is a joint decree, in which all of the respondents there have a common interest, and that, as two of them, namely, William Boyce and Anna C. Larson, did not join in the appeal, and no request was made of them to join therein, and no order of severance was made by the court below, and no notice of appeal was served on them, the appeal must be dismissed.

By the amendatory act of congress of June 19, 1886 (24 Stat. 79, 80), the provisions of what is commonly known as the "Limited Liability Act," originally enacted March 3, 1851 (9 Stat. 635), and the provisions of which have been substantially incorporated into Rev. St. §§ 4282–4290, are made applicable to all vessels used on lakes, rivers, or in inland navigation, including canal boats, barges, and lighters. Sections 4283 and 4284 of the Revised Statutes are as follows:

"Sec. 4283. The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, lost (loss), damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

"Sec. 4284. Whenever any such embezzlement, loss or destruction is suffered by several freighters or owners of goods, wares, merchandise, or any property whatever, on the same voyage, and the whole value of the vessel, and her freight for the voyage, is not sufficient to make compensation to each of them, they shall receive compensation from the owner of the vessel in proportion to their respective losses; and for that purpose the freighters and (owner) (owners) of the property, and the owner of the vessel, or any of them, may take the appropriate proceedings in any court, for the purpose of apportioning the sum for which the owner of the vessel may be liable among the parties entitled thereto."

To facilitate and further the proceedings authorized by the act of March 3, 1851, the supreme court promulgated certain supplemental rules of practice in admiralty, numbered, respectively, 54, 55, 56, and 57, which are found in 13 Wall. xii., xiii., and the validity of

which has been judicially determined. Providence & N. Y. S. S. Co. v. Hill Manuf'g Co., 109 U. S. 578–590, 3 Sup. Ct. 379, 617; Norwich Co. v. Wright, 13 Wall. 104. Those rules provide, among other things, that owners of vessels, making suitable allegations for the purpose, shall be at liberty to contest their liability, or the liability of the vessel, to pay any damages, as well as to show that, if liable, they are entitled to a limitation of liability. Rule 56; Providence & N. Y. S. S. Co. v. Hill Manuf'g Co., supra. And that is what the petitioners in the court below sought to do.

They commenced the proceedings by the filing in the district court for the district of Oregon of a petition by the Oregon Railway & Navigation Company and the Oregon Short Line & Utah Northern Railway Company, which set forth, among other things, the ownership by the Oregon Railway & Navigation Company of a certain barge known as the Columbia, used and operated upon the Columbia and Willamette rivers, and that the Oregon Short Line & Utah Northern Railway Company is engaged in operating steamboats and other vessels, and in owning and operating lighters and barges between Portland and Astoria, in the state of Oregon, and elsewhere, and during the times mentioned in the petition was lessee, from the Oregon Railway & Navigation Company, for a period of 99 years, from the 1st day of January, 1887, of the barge Columbia, and was at all the times mentioned in the petition operating that barge under the terms and provisions of the lease, and had the sole possession and control thereof; that on or about October 21, 1892, the barge Columbia left Portland with a cargo of wheat, for transportation to Astoria, the wheat being part of the cargo of the British ship Westgate, and destined to be transported by means of the barge Columbia and the ship Westgate from Portland, Or., to Liverpool, England; that the barge was seaworthy, and that the wheat was properly loaded thereon, and that all went well until the barge, on the night of the 21st of October, 1892, reached Astoria, at which point the barge intended to tie up alongside the dock of the Oregon Railway & Navigation Company; that, lying in front of the dock, and floating nearly level with the water, and designed for the purpose of preventing ships from chafing against the timbers of the dock, was a pontoon, consisting of 12x12-inch timbers, securely fastened together, and being 60 feet long, 1 foot thick, and 4 feet wide; that the barge was towed by the steamboat Ocklahama, and that the darkness of the night rendered it impossible for the crew and captain in charge of the Columbia to see the pontoon, and, in attempting to make a landing at the dock, the barge ran against the pontoon with sufficient force to break the stem and forefoot of the barge, and to start her timbers to such an extent that she commenced leaking; that those in charge of the barge deemed it necessary and advisable to remove her into shallower water, in order that the barge and her cargo might be more conveniently saved, and thereupon the barge was taken behind the dock, and placed alongside the rear portion thereof; that, after an examination had been made by the men in charge of the barge, it was found that she would probably float if the pumps were used, and thereupon the men in charge of her commenced using the pumps, and kept the leak

in control, so that the barge did not continue to make water faster than it was pumped out of her; that the cargo upon the barge was entirely loaded upon her deck, as is customary and proper in vessels of her character, and that, at the time the pumps were working, no part of her cargo in the barge was injured in any manner, but that the cargo was injured in the manner afterwards stated; that the men in charge of the barge undertook to stop the leak by building a bulkhead, intending to place between the bulkhead and the bow of the barge sacks of wheat, for the purpose of stopping the leak; that, in order to aid in the work of building the bulkhead, three men, among others, entered the hold of the barge, namely, Marshal Short, the captain of the Ocklahama, William Boyce, a deck hand on the Ocklahama, and one Gus Peterson, who was a deck hand either of the barge or of the Ocklahama; that the tide was at this time ebbing, and, while the men named were in the hold of the barge, the latter touched ground; that an examination was thereupon made by the men in charge of the barge as to her condition and position, and they thereupon concluded to continue the work of undertaking to stop the leak, believing that the barge would sink into the mud and remain upright; that, as the tide continued to flow the barge suddenly listed to one side, away from the dock, and partially turned over; that, as Short and Peterson undertook to escape from the hold of the barge, they were caught by the falling cargo, consisting of wheat in sacks, piled in tiers upon the deck of the barge, and were crushed and killed; that a large amount of the cargo was thrown into the water, and the barge subjected to such a severe strain that her house was carried away and her hull damaged; that Boyce claims to have been thrown down and injured as a result of the listing of the barge; that the accident happened, and the loss, damage, injury, and destruction set forth were occasioned, done, and occurred without the fault, privity, or knowledge of the petitioners or either of them, and were due solely to the perils of the sea; that, nevertheless, the administrators of Short and of Peterson, and the firm of Balfour, Guthrie & Co., threaten to and will, unless restrained as prayed, commence actions against the petitioners, or one of them, to recover damages claimed to be suffered by the accident; that on or about November 15, 1892, Boyce commenced an action in the circuit court of the state of Oregon for Multnomah county, against the petitioners, to recover damages in the sum of $15,000 for injuries alleged to have been suffered by him, which action is pending; that the claims so made by the persons mentioned, and each of them, are largely in excess of the value of the barge in the condition in which she was after the accident and damage on the 22d of October, 1892, when her voyage was completed; that there was no freight money due or owing to the barge or either of the petitioners on account of the transportation of the cargo of wheat, and that there was no freight then pending in connection with the barge; that the petitioners, and each of them, desire to contest their liability for the loss, destruction, damage, and injury occasioned by the accident, and also to claim the benefit of the limitation of liability provided by the acts of congress, and, to that end, desire an appraisement to be made and had of the amount or value of the interest of

each of said persons, and of the barge in the condition in which she was after the accident and damage on October 22, 1892, and of her freight then pending, and, for that purpose, petitioners ask that the barge be examined, and her value ascertained, by a commissioner of the circuit court, or by such other means as the court shall direct.

The petition further alleged, among other things, that the barge was, at the time of the accident, under the sole and exclusive management, operation, and control of the Oregon Short Line & Utah Northern Railway Company, and that none of the men on board of the barge were officers, agents, or employés of the Oregon Railway & Navigation Company; that the cargo of wheat belonging to Balfour, Guthrie & Co. was being carried by the Oregon Short Line & Utah Northern Railway Company under and by virtue of a bill of lading or shipping receipt issued by that company, and was not being carried, handled, or controlled in any manner by the Oregon Railway & Navigation Company. And the Oregon Short Line & Utah Northern Railway Company allege that the barge was in all respects sound, staunch, and seaworthy, and was properly manned, equipped, and provided for the voyage in which she was engaged, and under the charge and management of proper and suitable officers; that the captain of the barge executed to Balfour, Guthrie & Co. a shipping receipt or bill of lading for the wheat carried upon her, to wit, 8,898 sacks, which receipt contained the following provision, to wit: "In consideration of the reduced rate at which the articles covered by this receipt are carried, it is agreed by the undersigned, for and on behalf of the owner of the property, that the Oregon Short Line & Utah Northern Railway Company shall not be responsible for any injury or damage to the property described in this receipt not caused by the actual negligence of the said company or its agents;" that the agreement so contained in the receipt was signed by Balfour, Guthrie & Co., and that the wheat was being carried under the terms and provisions of that receipt, and not otherwise; that the injury to the wheat did not occur by reason of any negligence on the part of either of the petitioners, or of any of their agents or servants, but was caused solely by a peril over which the petitioners, and each of them, had no control, and which injury could not have been prevented by the exercise of any care on the part of the petitioners, their officers, agents, or employés. The petitioners further alleged that Short, Boyce, and Peterson, and each of them, well knew the danger connected with working in the hold of the barge, and that the danger was one of the risks of their employment, voluntarily assumed by them, and each of them had knowledge of the danger connected therewith, and that the injuries resulting to Boyce and to the estates of Short and Peterson were not caused by any negligence or lack of care or skill on the part of the petitioners, or any of their officers, agents, or employés, but were the results solely of the contributory negligence of Short, Boyce, and Peterson, and each of them, in entering and remaining in the hold of the barge, well knowing the danger connected with working therein; that the barge has not been libeled or arrested in any court for any of the injuries, loss, or destruction claimed, but the petitioners have been sued in the circuit court of

Multnomah county, of the state of Oregon, as aforesaid. And the petition concluded with the prayer that the court cause appraisement to be had of the value of the barge in the condition in which it was immediately after the accident, and, upon the ascertainment of such value, make an order for the payment thereof into court, or for the giving of a stipulation, with sureties, for the payment thereof into court whenever the same shall be ordered, and will issue a monition against all persons claiming damages for any loss, destruction, or damages or injury occasioned by the accident, citing them to appear before the court and make due proof of their claims at a time to be therein named, as to all of which the petitioners, and each of them, will contest their liability, independent of the limitation of liability claimed under the statutes aforesaid; and that the court designate a commissioner before whom proof of all claims presented in pursuance of such monition, shall be made, and that, upon the giving in of the report of the commissioner, and upon the hearing of the cause, if it shall appear that the petitioners are not liable for such loss, destruction, damage, and injury, it may be so finally decreed by the court, and that, in the meantime, until the final judgment of the court shall be given, an order be entered restraining the further prosecution of all or any suit or suits against the petitioners, or either of them, in respect to any claim or claims.

Upon the filing of the petition an order was made by the court appointing appraisers to appraise the value of the barge, her tackle, apparel, and furniture, as the same was at the end of her voyage at Astoria, on October 22, 1892, and after the injury and damage set forth in the petition, and also to determine the value of her freight then pending, if any. The appraisers, having qualified as such, appraised the barge, her tackle, apparel, and furniture at the sum of $100, and found that the freight pending was nothing, it not having been delivered according to contract. Thereupon the petitioners were authorized to give a stipulation for the value of the barge, her tackle, etc., as fixed in the appraisement, which was done. Whereupon, the court ordered the issuance and publication of a monition commanding all persons claiming damages for any loss, destruction, damage, or injuries occasioned by the disaster to the barge Columbia, referred to in the petition, to appear and make due proof of their respective claims on or before a certain fixed day, and naming a commissioner before whom such claims should be presented, and restraining all persons from proceeding further against the petitioners, or in respect to such claims, by any separate or independent suit. Pursuant to this monition, Balfour, Guthrie & Co., Malvina Short, as administratrix of the estate of the deceased Short, Sven Anderson, as administrator of the estate of the deceased Peterson, Anna C. Larson, the mother of the deceased Peterson, and William Boyce, appeared and answered separately, and by different proctors set up separately, and not in connection with each or any other, their own separate and distinct claims for loss and damage. The claims of Anna C. Larson and Sven Anderson, as administrator, and of Malvina Short, as administratrix, were for the death of Peterson and Short, respectively; that of Boyce was for injuries claimed to have been sustained by him, and for wages claimed

to be due him; and that of Balfour, Guthrie & Co. set up the contract of carriage in defense of the petitioners' right to exemption from liability, and in defense of their right to a limitation of liability.

In support of these several claims and defenses, the respective claimants filed, as has been said, separate answers, some of which were amended. The answer of Balfour, Guthrie & Co. alleged, among other things, that the barge was not sound, staunch, or seaworthy at the time she was loaded for the voyage in question; that her cargo was carelessly, negligently, and improperly loaded, and was, in fact, overloaded; that the barge was insufficiently manned and equipped; and that her crew was without the necessary skill and experience for the business in which she was engaged; that all these matters were at the time well known to the owners, their officers, agents, and employés; that both the tug Ocklahama and the barge were so negligently handled at the time of the landing of the barge at the dock at Astoria that her bow was stove in; and that, in removing her to the inside of the dock, petitioners were guilty of negligence and unskillfulness.

The answer of Boyce, as amended, among other things, denied that the barge was seaworthy or in good order or condition, or that her cargo was properly loaded, or that all went well with her until the night of the 21st of October, 1892, or that the accident was at all due to the perils of the sea; but, on the contrary, alleged that the barge was lashed to the side of the steam tug Ocklahama, and, under its control, was under such headway and high rate of speed, that the Ocklahama ran the bow of the barge under the dock, striking the same and cutting off several of the piles, and by which the anchor was thrust through the side of the barge; that the damage, injury, and loss mentioned in the petition were caused wholly by the negligent manner in which the Ocklahama ran the barge into the dock, and not by the careless manner in which the barge was overloaded or otherwise; that he (Boyce) was employed as a deck hand on board the Ocklahama, and was ordered by her captain to go in the hold of the barge, and that, while engaged in building the bulkhead therein, as ordered by the captain of the Ocklahama, the barge listed and started to turn over, when he (Boyce) undertook to escape from the hold, and was greatly injured by the falling of the wheat. In a cross libel filed by Boyce, he set up, among other things, the same matters alleged in his answer, and also that he was employed as a deck hand on the Ocklahama, at the monthly wages of $40, with board and lodging; that, in approaching the dock at Astoria, the captain of the Ocklahama, having in tow the barge, did not use due care or caution, but that the Ocklahama was so improperly and unskillfully managed and navigated that she was driven upon and into the wharf with such force as to drive one fluke of the anchor through the bottom of the barge, making a hole therein and letting the water into the hold thereof; that, while the steam tug and barge were under the full control of the master of the tug, he (Boyce) in obedience to the orders of the master, went from the tug Ocklahama to and upon the barge, and into her hold, to assist in repairing the leak, and, being in the performance of his duty, and in obedience to the orders of the master

of the Ocklahama, and without any want of due care upon his part, the barge turned to one side, causing the cargo of wheat to move and shift, whereby a large quantity of water entered the hold and the deck was broken in; that, as the barge was sinking, he (Boyce) endeavoring to save his life, undertook to escape from the hold, and was greatly injured by the falling sacks of wheat, the particulars of which injury he set out, and by which he lost all the profits of his labor from the 22d day of October, 1892, to wit, the sum of $40 per month and his board and lodging, and has become permanently injured, to his damage in the sum of $15,000, for all of which he asked judgment.

The answer of Malvina Short, as administratrix of the estate of the deceased Short, as also the answer of Sven Anderson as administrator of the estate of the deceased Peterson, alleged the same matters of negligence set out in the answer of Balfour, Guthrie & Co., except as to the alleged insufficiency and unskillfulness of the crew of the barge, and except, also, as to the allegation of negligence in making the landing at Astoria, and in moving the barge to the inside of the dock. They also allege that the barge was improperly constructed, in having a round, instead of a flat, bottom, and that there was negligence on the part of the petitioners in not having provided suitable pumps and pumping apparatus.

The answer of Anna C. Larson, mother of the deceased Peterson, among other things, denied that the barge was seaworthy, or in good order or condition, or that the cargo of wheat was properly loaded thereon, or that the accident occurred without the fault, privity, or knowledge of the petitioners, or was at all due to the perils of the sea, or that the barge was properly manned or equipped for the voyage in which she was engaged, or was under the charge of proper officers. It also alleged that she is the mother and sole surviving parent of the deceased Peterson, who was, at the time of the accident, in the employment of the petitioners as deck hand on the Ocklahama, and subject to the orders of the captain thereof, who was the deceased Short; that, on the afternoon of October 21, 1892, Short, pursuant to the orders of the petitioners, took the barge, which was then old, decayed, leaky, and utterly unseaworthy, and without suitable pumps and pumping apparatus, of all of which the petitioners were aware, and which was negligently and unskillfully overloaded, and by means of the steam tug Ocklahama, towed the barge, having the deceased Peterson on board as a deck hand, from Portland to one of its docks at Astoria; that, on October 22, 1892, at the dock at Astoria, while the barge was still attached to the Ocklahama, and in tow thereof, and in control of the captain of the Ocklahama, the deceased Peterson, by the order of the captain of the tug, went from the deck of the Ocklahama, on board the barge, and into her hold, to assist in repairing a leak therein, and, while so engaged, and without any fault or want of due care or caution on his part, but solely by reason of the unsound and unsafe condition of the barge, and of her overloading, and to the carelessness of the petitioners, the barge suddenly turned to one side, and gave way, thereby causing the cargo of wheat to shift, whereby a quantity of water was shipped into the hold, the deck of the barge broken, the hatchways filled with sacks

of wheat, by means of which the deceased Peterson then and there lost his life, and by which the respondent Anna C. Larson was damaged in the sum of $6,000, for which she asked judgment.

The barge Columbia, in respect to which the petitioners sought to limit their liability, not having been surrendered to a trustee, as provided for by section 4285 of the Revised Statutes, the proceeding taken was not a proceeding in rem, but a suit in equity (In re Morrison, 147 U. S. 14–34, 13 Sup. Ct. 246); and a suit in equity, not only for the purpose of limiting the liability of the petitioners, if any liability should be found to exist, but, as has been shown, also to have it judicially determined that no liability at all attached to the petitioners by reason of the injuries, damage, and loss mentioned in the petition. The monition issued and published in pursuance of the petition commanded all persons having claims growing out of the matters therein alleged to appear and intervene pro interesse suo. 13 Wall. 104; 109 U. S. 591, 3 Sup. Ct. 379, 617. All persons having such a claim or claims are forced by the provisions of the law into the one suit; but, when they come into it, each is entitled to set up the facts relied upon by him to make good his claim. Obviously, they may, and often do, rest upon separate and distinct grounds. It was so in the present case. All of the parties defendant, it is true, sought to defeat any limitation of liability of the petitioners, and each of the respondents sought to hold the petitioners liable for the full amount of damage sustained; but the ground of each claim, unless it be the claims of Sven Anderson, as administrator, and Anna C. Larson, was certainly separate and distinct from any other. The claim of Balfour, Guthrie & Co. was for damages for breach of a contract of carriage; that of Malvina Short, as administratrix, was for damages sustained by the death of her husband; of Boyce, for damages for loss of wages and for personal injuries sustained by himself; and those of Sven Anderson, as administrator, and Anna C. Larson, for damages sustained by the death of Peterson.

As has been shown, the purpose of the proceedings on the part of the petitioners was not only the limitation of their liability, but to obtain a decree that they are not liable at all by reason of any of the matters or things alleged in the petition. The subject of the suit, therefore, goes far beyond the value of the barge Columbia, for which the petitioners gave a stipulation, and involves subject-matters in which the various claimants have no common interest. What interest has Malvina Short, as administratrix, or Sven Anderson, as administrator, or Boyce, or Anna C. Larson, in the wheat of Balfour, Guthrie & Co. that was lost? What interest has that company in the death of Short, or of Peterson, or in the injuries and damage sustained by Boyce? And what interest has Malvina Short, as administratrix, in the death of Peterson, or in any of the injuries or damage sustained by Boyce? Or Anderson, as administrator, or Anna C. Larson, in the death of Short, or in the injuries and damage sustained by Boyce? Or Boyce, in the death of Short or Peterson? Obviously, none. These causes of action are the subject-matters of the suit, in which the interests are manifestly separate and distinct. In no respect does the stipu-

lated value of the barge, which the petitioners offer to give in satisfaction of all of the claims of the respondents, constitute the subject-matter. If so, what about the Ocklahama, which they do not bring into the suit at all? And yet one of the principal questions in the case is whether the petitioners are not required to surrender the Ocklahama as a condition precedent to securing a limitation of liability, if they are entitled to any such limitation at all. The fact that each of the claims may be established by the same proof does not convert separate and distinct subject-matters and separate and distinct claims into a common subject-matter and a common claim, nor give to the various claimants a common interest therein.

The proceedings here in question are quite analogous to joint suits for seamen's wages, and to the practice in cases of salvage. In Oliver v. Alexander, 6 Pet. 143, which was a libel by officers and seamen for their wages, and in which proceeding a separate decree was entered by the trial court for each libelant, for the amount found due him, and apportioning pro rata the payment of the same out of the funds in court and decreeing the deficit to be paid by the owners of the ship, the sums so decreed to the libelants, respectively, in no case exceeded $900. From the separate decrees so rendered, an appeal was taken to the supreme court, the appellant giving several appeal bonds upon the appeal from each decree, as well as a joint appeal bond for the whole. A motion was made to dismiss the appeal upon the ground that the sum in controversy in each decree was less than $2,000, and, as such, insufficient to give the supreme court appellate jurisdiction. The motion was resisted upon the ground that the aggregate in controversy under the whole of the decrees, taken together, greatly exceeded that value. The court granted the motion, and dismissed the appeal for want of jurisdiction, and in the course of its opinion said:

"It is well known that every seaman has a right to sue severally for his own wages in the courts of common law, and that a joint action cannot be maintained in such courts, by any number of seamen, for wages accruing under the same shipping articles for the same voyage. The reason is that the common law will not tolerate a joint action, except by persons who have a joint interest and upon a joint contract. If the cause of action be several, the suit must be several also. But a different course of practice has prevailed for ages in the court of admiralty in regard to suits for seamen's wages. It is a special favor, and a peculiar privilege allowed to them, and to them only, and is confined strictly to demands for wages. The reason upon which the privilege is founded is equally wise and humane. It is, to save the parties from oppressive costs and expenses, and to enable speedy justice to be administered to all who stand in a similar predicament, —in the expressive language of the maritime law, 'velis levatis.' And the benefit is equally as great to the shipowner as to the seamen, though the burden would otherwise fall upon the latter, from their general improvidence and poverty, with a far heavier weight. A joint libel may, therefore, always be filed in the admiralty by all the seamen who claim wages for services rendered in the same voyage under the same shipping articles. But, although the libel is thus in form joint, the contract is always treated in the admiralty, according to the truth of the case, as a several and distinct contract with each seaman. Each is to stand or fall by the merits of his own claim, and is unaffected by those of his colibelants. The defense which is good against one seaman may be wholly inapplicable to another. One may have been paid, another may not have performed the serv-

ice, and another may have forfeited, in whole or in part, his claim to wages. But no decree whatsoever which is made in regard to such claim can possibly avail to the prejudice of the merits of others which do not fall within the same predicament. And wherever, from the nature of the defense, it is inapplicable to the whole crew, the answer invariably contains separate averments, and is applied to each claim according to its own peculiar circumstances. The decree follows the same rule, and assigns to each seaman severally the amount to which he is entitled, and dismisses the libel as to those, and those only, who have maintained no right to the interposition of the court in their favor. The whole proceeding, therefore, from the beginning to the end of the suit, though it assumes the form of a joint suit, is in reality a mere joinder of distinct causes of action, by distinct parties, growing out of the same contract, and bears some analogy to the known practice at the common law of consolidating actions against different underwriters, founded upon the same policy of insurance. Be this as it may, it is the established practice of the admiralty. The act of congress, already referred to, adopts and sanctions the practice; and it enacts that, in proceedings in rem against the ship for mariner's wages, 'all the seamen or mariners having cause of complaint of the like kind against the same ship or vessel, shall be joined as complainants.' Act 1790, c. 29, § 6. It thus converts what by the admiralty law is a privilege into a positive obligation where the seamen commence a suit at the same time in the same court by a proceeding in rem for their wages. And it further directs that 'the suit shall be proceeded on in the said court, and final judgment be given, according to the course of admiralty courts in such cases used.' Act 1790, c. 29, § 6. From this summary view of the nature and operation of the proceedings in the admiralty, in cases of joint libels for wages, it is obvious that the claim of each seaman is distinct and several, and the decree upon each claim is, in like manner, distinct and several. One seaman cannot appeal from the decree made in regard to the claim of another, for he has no interest in it and cannot be aggrieved by it. The controversy, so far as he is concerned, is confined solely to his own claim; and the matter of dispute between him and the owners or other respondents is the sum or value of his own claim, without any reference to the claims of others."

In Thomas v. Lane, 2 Sumn. 1, Fed. Cas. No. 13,902, which was a cause of salvage, Judge Story said:

"My opinion is that there is no difference as to the right of appeal, whether the respondents sever or join in their answer or pleadings, if the defense is several in its nature. * * * In case of an appeal from a joint decree in chancery against the defendants in the suit all the defendants affected by the decree must join; but this is because they are united in interest. And in suits in admiralty, founded upon contracts, I should have no doubt that the appeal must be by all the respondents charged, either personally or in interest, by the decree. But wherever the case, though joint in form, is in reality several in its character, as in cases of salvage, where distinct owners intervene severally as respondents, each for his own interest, it seems to me that the decree, though in form joint, must be treated as several in its operation, and that each defendant must possess a several right of appeal for his own distinct interest."

In all of these cases the procedure is, in truth, a joinder of separate and distinct causes of action, the decrees in which, where several in their nature, should be treated as several in their operation even though joint in form. See, also, Hanrick v. Patrick, 119 U. S. 156, 7 Sup. Ct. 147; Russell v. Stansell, 105 U. S. 303; Gray v. Havemeyer, 3 C. C. A. 497, 53 Fed. 174. William Boyce, therefore, not having any interest in the questions at issue between the petitioners and the appellants, was not a necessary party to their appeal; and, if it be conceded that Anna C. Larson was a necessary party to the appeal of Sven Anderson, as administrator of the estate of the deceased Peterson, her appearance in this court on the appeal,

and the filing of a brief by her proctors, cure the lack of notice, since all that is required is that she be heard upon the appeal. Penhallow v. Doane's Adm'rs, 3 Dall. 87. For the reasons stated, the motion to dismiss the appeal is denied, and we proceed to a consideration of the merits.

All of the respondents and cross libelants not only contended that the barge was, from the inception of the voyage, unseaworthy, but also that the barge and tug were, in law, one vessel, and that, to avail themselves of the benefit of the limited liability act, the owners must surrender the tug as well as the barge in satisfaction of the loss and damage complained of. The court below found the fact to be that the barge was, at the time of the accident, seaworthy, and, as the evidence in respect to that question is decidedly conflicting, the finding of the trial court must be accepted on this appeal as conclusive. The Alejandro, 6 C. C. A. 54, 56 Fed. 621. The court below also found that the master of the barge was negligent in shifting certain portions of her cargo, and that this negligence of the master of the barge was the proximate cause of the sinking of the barge, and of the loss and injuries sustained by the respective claimants, and, holding, as it did, that "the tow service of the tug was ended before the proximate cause of the accident in question was set in motion," confined the compensation of the respective claimants to the stipulated value of the barge. In this we think the court below was in error.

The case shows that the wheat in question was destined to be transported from Portland, Or., to Liverpool, England, by means of the barge Columbia and the British ship Westgate. That fact appears, not only from the testimony in the case, but from the petition as well. The Oregon Short Line & Utah Northern Railway Company, lessee of the barge and of the tug Ocklahama, undertook to transport the wheat from Portland to the ship Westgate. The shipping receipt issued by the master of the barge to the owner of the wheat was issued on behalf of the owner of the craft. The contract of carriage was the owners' contract, and the terms of the contract were that the carrier was only to be liable to the owner of the cargo for negligence. According to the contract, the carrier was liable for negligence. As the wheat was to be carried on board the barge, which had no motive power, of necessity such power had to be supplied by the carrier. This the carrier did, as was its custom, by means of a tug,— in this instance, the tug Ocklahama, owned by the Oregon Railway & Navigation Company, and under lease to the Oregon Short Line & Utah Northern Railway Company, as was the barge Columbia. When the tug made fast and took in tow the barge, to perform the contract of carriage, the two became one vessel for the purpose of that voyage,—as much so as if she had been taken bodily on board the tug, instead of being made fast thereto by means of lines. The Northern Belle, 9 Wall. 526–529; Sturgis v. Boyer, 24 How. 110–122; The Merrimac, 2 Sawy. 595, Fed. Cas. No. 9,478; The Bordentown, 40 Fed. 686.

In the case of The Northern Belle, the supreme court, in speaking of the facts there appearing, said:

"The barges are owned by the same persons who own the steamboats by which they are propelled, and are generally considered as attached to and making part of the particular boat in connection with which they are used, though quite often an individual or corporation owning several boats running in a particular trade have a large number of barges, which are taken in tow by whatever boat of the same line may be found most convenient. In every case, however, the barge is considered as belonging to the boat to which she is attached for the purposes of that voyage."

In The Keokuk, 9 Wall. 519, the court found, from the evidence, that the carrier had made no contract to carry the wheat that had been put in one of the carrier's barges without its knowledge, and which, therefore, had not been cared for by the carrier and lost; but the court said:

"It is very clear, had the steamer taken the barge in tow, the lien would have attached, although the bills of lading were not executed, because the act of towing the barge would be evidence that the grain was received, and that there was a contract to carry it safely. And the steamer would be equally liable if the barge had been left at the landing by the fault of the officers of the boat. But the evidence not only fails to prove this, but establishes the contrary conclusion."

In the present case, the barge and tug had the same owner, and both were operated by the same carrier. In the voyage, both were necessarily under the control of the master of the tug. They constituted the instrument of carriage, to which the wheat was liable for the service, and on which the owners of the cargo had a lien for the due performance of the contract of carriage. The case shows that the tug, having the barge loaded with wheat in tow, left Portland about 1 o'clock in the afternoon of October 21, 1892, and reached Astoria about 12 o'clock that night. Notwithstanding there is nothing in the case to show that the contract of carriage contemplated the landing of the wheat at Astoria, or the tying up of the barge at the dock at that place, but, on the contrary, the delivery of the wheat from the barge to the ship Westgate, yet the tug—due, probably, to the late hour of arrival—undertook to tie up at the dock, and, in doing so, carelessly ran the barge against the piles of the dock, and with such force as to knock a hole in her stem, thereby causing a serious leak. The master of the tug continued, after the accident, to exercise control over the barge, as well as the tug, changed its position, put the engineer of the tug at work with a siphon to pump the water out of the barge, and himself went, with one of the deck hands of the tug, into the hold of the barge for the purpose of building a bulkhead to guard against the water, and was so engaged when, about two hours after the accident, the barge collapsed, causing the death of the master and deck hand of the tug, the injury of Boyce, a deck hand of the barge, and the loss of the wheat of Balfour, Guthrie & Co.

The court below held that the collapsing of the barge was occasioned by the negligent shifting of some sacks of wheat by the master of the barge, and that that act of his was the proximate cause of the loss and damage in question. But no question of proximate cause, we think, arises in the case, for the reason that the tug and barge are, in law, considered one vessel, for the purpose of the voyage in question, and, whether the accident giving rise to the loss and damage

be directly attributable to the acts of the master of the barge, or to those of the master of the tug, it is equally the negligence of the carrier, for which it contracted to be liable. It results that, in according the petitioners a limitation of liability without the surrender of the tug Ocklahama, the court below was in error.

Judgment reversed, and cause remanded for further proceedings not inconsistent with this opinion.

McKENNA, Circuit Judge (dissenting). I am unable to agree with the majority of the court in the conclusions reached on the motion to dismiss the appeal, for the reasons stated by Judge HANFORD in the opinion of the court at the original hearing, and reported in 67 Fed. 942, 15 C. C. A. 91. Jurisdiction being entertained, I concur in the judgment requiring the surrender of the steamer or tug Ocklahama, as well as of the barge.