### THE JOHN AND WINTHROP.

(Circuit Court of Appeals, Ninth Circuit. October 3, 1910.)

#### No. 1,772.

1. SEAMEN (§ 30*)—RECIPROCAL DUTIES OF MASTER AND SEAMEN.

There is an implied obligation on the part of the master of a vessel that he will protect the seaman against ill usage and provide for him good treatment; but there is a reciprocal duty on the part of the seaman to obey all lawful commands of the master and not to violate the discipline and economy of the ship.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 195–211; Dec. Dig. § 30.*]

2. SEAMEN (§ 30*)—REFUSAL TO PERFORM DUTIES—DISCIPLINE AND PUNISHMENT.

Libelants signed as seamen for a whaling voyage; the articles providing that they should do their duty and obey the lawful commands of the officers while cruising or in port, and that they should not go out of the vessel without leave from the captain or commanding officer. While in the port of Hakodate, Japan, they were given shore leave by watches, but required to return at a stated time, and each was also given a small sum of money. On one occasion, five of them having failed to return, at the direction of the consular agent further leave was denied until the missing men should be arrested and returned, whereupon the entire crew quit work and refused to do their duty, in which refusal the most of them persisted for seven days. On the fourth day by direction of the consular agent they were ironed, and on the sixth, having made threats against the master and the vessel being then at sea, they were handcuffed, placed in the between-decks on chains run between the arms of each man with the ends made fast to the sides of the vessel about 4½ feet above the deck. At night the chain was lowered, so they could lie on the deck. On the next day they agreed to return to work and were at once released. They were requested to go to work each day, and knew that as soon as they agreed to do so they would be freed. *Held*, that such action of the master was not in excess of the punishment authorized by Rev. St. § 4596, as amended by Act Dec. 21, 1898, c. 28, § 19, 30 Stat. 760 (U. S. Comp. St. 1901, p. 3113), but was justified

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

under the circumstances, and that the vessel was not liable in damages therefor.

[Ed. Note.—For other cases, see Seamen, Cent. Dig. § 200; Dec. Dig. § 30.*]

**3.** ADMIRALTY (§ 117*)—APPEAL—REVIEW.

Where a joint libel by seamen against the ship stated separate and. distinct causes of action, as to some of which no finding was made or decree entered by the trial court, and the only appeal was from decrees in favor of certain of the libelants on one cause of action, taken by the claimant, which in. accordance with the rules embodied in the record only the evidence relating to such cause of action, the appellate court cannot on such record try the case de novo, and enter decrees for libelants on the other causes of action.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 748; Dec. Dig. § 117.*

Admission of new proofs on appeal in admiralty, see note to The Venezuela, 3 C. C. A. 322.]

Appeal from the District Court of the United States for the Northern District of California.

Suit in admiralty by F. Lopes and 16 other seamen against the whaling bark John and Winthrop (H. J. Knowles and the Millen Griffith Company, claimants), in which two other seamen intervened. Decree for libelants and interveners, and claimants appeal. Reversed.

This is an action in rem, brought by the libelant F. Lopes and 16 others against the whaling bark John and Winthrop for wages and for breach of contract of good treatment while the libelants were on board the bark as seamen on a whaling voyage on said vessel in the North Pacific and Arctic Oceans. There is also an intervention of two other seamen alleging the same causes of action. The shipping articles signed by the libelants and interveners provided for a term of service not to exceed 12 calendar months, and in consideration of the lay in the catch of the vessel the seamen to receive no share or interest in the trade. The share of each of the libelants and interveners was to be a lay of $1/_{175}$ in addition to an advance of $35 paid them on signing the shipping articles. It was provided in the articles that the "seamen or mariners do severally hereby promise and oblige themselves to do their duty and obey the lawful commands of the officers on board said vessel or boats thereunto belonging as become good and faithful seamen or mariners while cruising for whales and at all places where said vessel shall put in or anchor at during said voyage, * * * and not to neglect or refuse doing their duty by day or night, and that they shall not go out of said vessel on board any other vessel, or be on shore under any pretense whatever until the aforesaid voyage be ended and the vessel discharged of her loading, without leave first obtained of the captain or commanding officer on board."

These articles were signed by the libelants in San Francisco in January, 1908. The vessel on her voyage reached the port of Hakodate, Japan, on July 23, 1908. It appears that on the next day the crew asked for and was granted shore leave by the master; the two watches being required to take their turns on successive days. The permission was given the men by the master to go ashore in the evening on the express condition that they would return on the next morning at 6 a. m. There was nothing due the men at that time, but the master gave them a small sum—one yen each. The first watch to go ashore was the starboard watch, on Saturday, July 25th. This watch returned on Sunday morning, July 26th, in accordance with the agreement had with the master, and on Sunday evening the port watch went ashore. This watch returned on Monday morning in accordance with the agreement. On Monday evening, July 27th, the starboard watch again went ashore; but on

Tuesday morning, July 28th, all the members of the watch did not return. Five of the watch were missing, namely, Olsen, Svensson, Mattsen, Costa, and Wilkins. The master reported these missing members of the crew to Mr. E. J. King, the United States consular agent at Hakodate, who applied to the local authorities for their arrest. The consular agent at the same time directed the master not to allow any more of the crew to go ,ashore, as it would interfere with the apprehension of those that were missing. On the afternoon of Tuesday Olsen, Svensson, and Mattsen, were brought on board the vessel by the police, and on Wednesday, July 29th, Costa was returned to the vessel by the police, but Wilkins was not found and brought back until Friday, July 31st. In the meantime, and on Tuesday, July 28th, the port watch applied for leave to go ashore and was refused by the master, in accordance with the directions of the consular agent. Thereupon the entire crew quit work. At this time the master was ashore on business with the consular agent in connection with missing members of the crew. When the master returned and was informed of the situation by his chief mate, he asked the crew to go to work; but they refused, insisting that they should have more money and shore liberty. The master explained to the men the orders he had from the consular agent, but they persisted in their refusal to go to work. On July 29th and 30th the crew continued their refusal to go to work. They, however, sent a note to Mr. King, the consular agent, asking him to come aboard the vessel to hear their complaint; but as he was sick at the time he requested the master to allow two of the men to come and see him. On Friday, July 31st, two of the men, Prescott and Taylor, were allowed to go ashore to see the consular agent concerning their complaint and the right of the men to have shore leave. These two men went ashore as the representatives of the other members of the complaining crew. The consular agent heard their complaint, but refused to interfere further than to direct the master to place all the men in irons who refused to do duty. On Saturday, August 1st, each member of the crew was again asked to go to work, and upon refusing to do so several members of the crew were placed in irons; but, as there was not a sufficient number of irons on the vessel for all the disobedient members of the crew, additional irons were obtained from the consular agent, and subsequently all of the crew refusing to do duty were placed in irons, but allowed the freedom of the vessel and their regular rations. Three times on Saturday the members of the crew who had been placed in irons were requested to return to duty, but all refused. Some were willing to go to work, but were afraid of the leaders, who told the others not to go to work. On Sunday, August 2d, the members of the crew in irons were asked on several different occasions to go to work, but on each occasion all refused as before.

The vessel made ready to sail from the port of Hakodate on Sunday, but before sailing the American consular agent came on board the vessel and had the men called on deck, and thereupon each man was asked to return to duty, but they all refused; the ground of refusal being that they had been refused shore leave and money. The vessel was taken to sea by the officers, assisted by the consular agent and three seamen who had not refused to do duty. On Monday, August 3d, the vessel was at sea, and upon the continued refusal of the disobedient crew to go to work, coupled with threats and the use of abusive language against the master, he called all the officers together to consider what should be done. After consultation it was determined to place the men on chains fastened to beams in the main hold or between-decks. There were three small chains stretched parallel to the three sides of the hatchway, one across athwartships and two on each side, running fore and aft. The men were handcuffed, and a chain run between the arms of each man, and the chain suspended from $4\frac{1}{2}$ to 5 feet above the deck; but they were not triced up in the sense in which that term is used on board ship. The purpose of the chain was to keep the men from dancing, or moving around, or lying around. There was the further reason for the chain in the fact that there was no other place or method of confining them. The handcuffs were not fastened to the chain, but could be rested upon it or elevated above it. The men could move along the chain from right to left from two to four feet. Their rations while on the chain were bread and water. At meals and while attending to

the calls of nature the men were released from the chain from 20 to 30 minutes. On Monday night, August 3d, the chain was let down so that the men could lie down on deck. On Tuesday morning, August 4th, the chain was again suspended, and the men were again asked in the morning and at noon to return to duty, and they at first refused; but in the afternoon they asked to have the articles read to them, which was done, and about 6 o'clock in the evening they signified their willingness to return to duty, and they were immediately taken from the chain and released from their handcuffs. Some of the men complained of the punishment they received because the handcuffs made their wrists sore, and others because the deck where they slept on Monday night was wet from the splashing of a water-cask. The men had been told, and they knew all the time, that as soon as they were willing to go to work they would be released from the chain and relieved from the handcuffs. The record does not contain all the testimony in the case.

The foregoing facts leading up to the action of the master on August 3, 1909, when the libelants and interveners were placed on the chain, are taken from the stipulations and admissions of the parties to the action, the entries in the mate's log book, and a certified statement, signed by E. J. King, the American consular agent at Hakodate, and such testimony as has been incorporated in the record relating to those occurrences; but the testimony of the witnesses that has been brought here on this appeal relates mainly to the occurrences on board the vessel on and after August 3, 1909, and after the libelants and interveners had been placed on the chain, the appeal being limited in express terms to so much of the decree as was entered in favor of the libelants and interveners upon such causes of action.

Upon arrival in San Francisco the crew were paid $1 each, for which they each executed a receipt, releasing the vessel, her owners, agents, master, or officers from all claims whatsoever. Subsequently they brought this action in the District Court. Upon the trial of the case the court awarded the libelants Olsen and Wilkins $50 each, on the ground that the master was not justified in placing Olsen and Wilkins in irons and imprisoning them on said vessel while in the harbor of Hakodate. To the remaining libelants, Lopes, Svensson, Brown, McVey, Williamson, Naza, McDonell, Cramer, Olivier, Fraser, Mattson, Johnson, Anderson, George, Mahoe, Prescott, and Berg, the court awarded each the sum of $125, on the ground that the master was not justified in placing the libelants in irons and confining them in the main hold or between-decks of said vessel in the manner described.

No appeal has been taken from the award of $50 each to Olsen and Wilkins. It is only that part of the decree awarding $125 to each of the latter named libelants that is involved in this appeal.

Andros & Hengstler and Louis T. Hengstler, for appellants.

F. R. Wall, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). This is an action by libelants and interveners for damages for breach of contract for good treatment. There is an implied obligation on the part of the master of a vessel that he will protect the seaman against ill usage and provide for him good treatment; but there are also reciprocal duties on the part of the seaman. He assumes the obligation to obey all lawful commands of the master and not to violate the discipline and economy of the ship. Curtis, Rights and Duties of Merchant Seamen, pp. 27, 33; Limeland v. Stephens, 3 Espinasse, 268. In Robertson v. Baldwin, 165 U. S. 275, 282, 17 Sup. Ct. 326, 329 (41 L. Ed. 715), the Supreme Court said:

"From the earliest historical period the contract of the sailor has been treated as an exceptional one, and involving, to a certain extent, the surrender of his personal liberty during the life of the contract. Indeed, the business of

navigation could scarcely be carried on without some guaranty, beyond the ordinary civil remedies upon contract, that the sailor will not desert the ship at a critical moment, or leave her at some place where seamen are impossible to be obtained—as Molloy forcibly expresses it, 'to rot in her neglected brine.' Such desertion might involve a long delay of the vessel while the master is seeking another crew, an abandonment of the voyage, and, in some cases, the safety of the ship itself. Hence the laws of nearly all maritime nations have made provision for securing personal attendance of the crew on board, and for their criminal punishment for desertion, or absence without leave during the life of the shipping articles."

The contract in this case expressly provided that the libelants and interveners would "do their duty and obey the lawful commands of the officers on board said vessel or boats thereunto belonging as become good and faithful seamen or mariners while cruising for whales and at all places where said vessel shall put in or anchor during said voyage." The libelants and interveners quit work on July 28th, and, notwithstanding they were directed by the master to return to their work and do their duty, they disobeyed the master's order and refused to work; and this they continued to do for seven days. The master's orders to return to work were lawful commands, and under the law as well as the terms of their contract they were bound to obey them. Their complaint that they were denied shore liberty and money did not justify them in disobeying the master's command. They were not entitled of right to either. They had agreed in their contract "not to neglect or refuse doing their duty by day or night," and that they would "not go out of said vessel * * * or be on shore under any pretense whatever until the voyage be ended and the vessel discharged of her loading without leave first obtained of the captain or commanding officer on board." The master had, as a matter of favor, agreed to give them shore liberty, and had given each a small sum of money; but it was on the express condition that the entire watch should return at the end of the leave, a perfectly reasonable condition under the circumstances. When five members of the starboard watch failed to return at the expiration of their leave on July 28th, the shore liberty of the crew was at an end. They did not then continue to do their duty aboard the vessel until the return of the missing members of the crew should restore affairs to a normal condition, when further shore liberty might reasonably have been expected; but they all immediately quit work, and, although directed by the master to return to their work, they disobeyed his commands. For three days, July 29th, 30th, and 31st, the master submitted to this continued disobedience without subjecting the offenders to any punishment whatever. It was not until August 1st, and then under the direction of the consular agent, that the offenders were placed in irons, but not until each member of the crew had been asked to return to his duty. For the next two days the crew was in irons; but on each day either the master or mate asked them to return to their duty.

On Sunday, August 2d, the consular agent boarded the vessel and asked the men to return to work; but they continued their disobedience. Finally the men not only continued their disobedience, but threatened the master in abusive language not necessary to repeat. Then, on August 3d, after consultation with his officers, the master

placed the offenders on small chains stretched in between-decks. They were not triced up, and the handcuffs were not fastened to the chain. The men could move from right to left or left to right from two to four feet, and could rest their hands on the chain or raise them above it.

Section 4596 of the Revised Statutes, as amended by Act Dec. 21, 1898, c. 28, § 19, 30 Stat. 755, 760 (U. S. Comp. St. 1901, p. 3113), provides as follows:

"Whenever any seaman who has been lawfully engaged or any apprentice to the sea service commits any of the following offenses he shall be punishable as follows:

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

"Fourth. For willful disobedience to any lawful command at sea, by being, at the option of the master, placed in irons until such disobedience shall cease, and upon arrival in port, if of the United States, by forfeiture from his wages of not more than four days' pay, or upon arrival in a foreign port by forfeiture from his wages of not more than four days' pay, or, at the discretion of the court, by imprisonment for not more than one month.

"Fifth. For continued willful disobedience to lawful command or continued willful neglect of duty at sea by being, at the option of the master, placed in irons, on bread and water, with full rations every fifth day, until such disobedience shall cease, and upon arrival in port, if of the United States, by forfeiture, for every twenty-four hours' continuance of such disobedience or neglect, of either a sum of not more than twelve days' pay or sufficient to defray any expenses which have been properly incurred in hiring a substitute, or upon arrival in a foreign port, in addition to the above penalty, by imprisonment for not more than three months, at the discretion of the court."

There can be no question but that for their disobedience and continued disobedience the master was authorized to place the men in irons and on bread and water. Was he authorized to place them on the chains in the manner described? The only actual punishment in being placed on the chains appears to have been the restraint imposed upon them in not being permitted to wander around the ship, destroy its discipline, and make trouble for others. The placing of an offender in irons necessarily involves some kind of restraint. If it is a single individual to be punished, he may be placed in a room by himself; but where there are many offenders, as in this case, and where there is no room where they can be placed, the chain appears to have been the only alternative, and as it was stretched was no more of a punishment than had they been placed in a room. Some complaint is made that the handcuffs made some of the men's hands sore and that the water splashed out of the water cask near where they slept on the deck; but this does not appear to have been any part of the intended punishment, or of its necessary consequences, nor do they appear to have made any complaint at the time about the handcuffs or water. Had these matters been called to the attention of the officers, they would probably have remedied this feature of the punishment. This part of the punishment, if it can be so characterized, was, therefore, self-inflicted. Furthermore, they were told that when they were ready to return to duty the handcuffs would be removed and they would, of course, be relieved from the chain.

It is an ancient and well-established rule that the plaintiff is not legally damaged by consequences which, if acting as prudent men or-

dinarily do, he could have avoided. As stated by Sedgwick on Damages, § 202:

"Such consequences can hardly be the direct or natural consequence of the defendant's wrong, since it is at the plaintiff's option to suffer them."

The author adds:

"They are really excluded from the recovery as remote. In this view the doctrine would rest on the intervention of the plaintiff's will as an independent cause."

The appellees contend that on this appeal the several causes of action stated in the libel and interventions must be heard de novo, the amount of the awards increased, and the decree otherwise affirmed. The action was a joinder of several separate and distinct causes of action brought by several distinct parties. Upon these causes of action the court below awarded the libelants Olsen and Wilkins $50 each; but the appeal from the decree with respect to these two separate and distinct causes of action has been waived by the appellants, and we think the correctness of the decree with respect to those two causes of action is not before the court for review.

Upon the causes of action stated in the libel wherein libelants claim damages for breach of contract of good treatment prior to August 3, 1908, no finding was made with respect to such causes of action and no decree entered by the court upon such causes of action; and as no appeal has been prosecuted from the decree by the libelants with respect to such causes of action, it is contended by the appellants that the decree with respect thereto is not before the court. The appeal in this case is with respect to so much of the decree as awards judgments in favor of the libelants and interveners on the causes of action charging breach of contracts on and after August 3, 1908, and it comes to this court with the proofs relating to such causes of action; that is to say, the appellant has complied with the general rule in admiralty requiring it to bring up "all the testimony and other proofs adduced in the cause" with respect to such causes of action. The record does not purport to contain the proofs relating to the causes of action charging breaches of contract prior to August 3, 1908. Appellant's notice of appeal is as follows:

"Please take notice that the claimants in the above-entitled cause hereby appeal from the final decree made and entered herein on the 24th day of May, 1909, to the United States Circuit Court of Appeals for the Ninth Circuit.

"Claimants desire to review only the following questions involved in the cause, to wit:

"First. The right of the libelants Olsen and Wilkins to recover damages for being placed in irons, and imprisoned on said vessel while she was in the harbor of Hakodate, Japan.

"Second. The right of any of the libelants to recover damages for being, on or about August 3, 1909, when the John and Winthrop was at sea, placed in irons and confined in the main hold or between-decks of said vessel."

Subsequently appellants filed and served on the appellees a further notice as to the record on appeal as follows:

"Appellants hereby waive the review of the question designated as 'First' in their notice of appeal, dated July 14, 1909, to wit, the right of libelants Olsen and Wilkins to recover damages, and intend to review only question

'Second' in said notice of appeal referred to, to wit, the right of any of the libelants to recover damages for being, on or about August 3, 1908, when the John and Winthrop was at sea, placed in irons and confined in the main hold or between-decks of said vessel.

"Accordingly appellants waive review of questions 1, 2, and 3, contained in the assignments of errors filed herein, and desire to assign as errors on their appeal, and rely only upon, errors numbered 4 to 13, inclusively, in said assignment of errors.

"For the consideration of the errors stated, appellants think the following parts of the record, and no other parts thereof, necessary, and appellants therefore request that only the following parts of the record be printed, and that all other parts thereof be omitted from the apostles."

The record appears to have been prepared in accordance with this notice. Had the appellees desired the review of the decree with respect to the causes of action alleging breach of contracts prior to August 3, 1908, they should have prosecuted an appeal from the decree upon that ground, and under the rule they would have been required to bring up all the testimony and other proofs adduced in the cause relating to such causes of action. In the absence of such a record we cannot review the decree with respect to the causes of action charging breach of contracts prior to August 3, 1908.

The case comes under the rule declared in Oliver v. Alexander, 6 Pet. 143, 8 L. Ed. 349, where the Supreme Court said:

"The whole proceeding, therefore, from the beginning to the end of the suit, though it assumes the form of a joint suit, is, in reality, a mere joinder of distinct causes of action, by distinct parties, growing out of the same contract. * * * The claim of each seaman is distinct and several; and the decree upon each claim is, in like manner, distinct and several. One seaman cannot appeal from the decree made in regard to the claim of another; for he has no interest in it, and cannot be aggrieved by it. The controversy, so far as he is concerned, is confined solely to his own claim; and the matter of dispute between him and the owners or other respondents is the sum or value of his own claim, without any reference to the claims of others."

In The Columbia, 73 Fed. 226, 235, 19 C. C. A. 436, 445, this court applied this rule in a proceeding for the limitation of liability of an owner of a vessel under this statute with this remark:

"The proceedings here in question are quite analogous to joint suits for seamen's wages and to the practice in cases of salvage."

The rule referred to in the case of The San Rafael, 141 Fed. 270, 72 C. C. A. 388, "that an appeal in admiralty from the District Court to the Circuit Court vacates altogether the decree of the District Court, and that the case is tried de novo in the Circuit Court," is therefore not applicable to this case.

The decree of the District Court is reversed, with instructions to dismiss the causes of action in the libel for breach of contracts of good treatment on and after August 3, 1908.