## Case No. 12,356.

The SARATOGA v. FOUR HUNDRED AND THIRTY-EIGHT BALES OF COTTON.

[1 Woods, 75.] [1]

Circuit Court, D. Louisiana. Nov. Term, 1870.

AFFREIGHTMENT — WITHOUT CONSENT OF OWNER —CAPTURED PROPERTY—ADMIRALTY— APPEAL—COSTS.

1. Where a treasury agent seized a lot of cotton as captured or abandoned property, and the same was transported to New Orleans: *Held*, that the claimant of the cotton could not be required to pay the freight and charges on the same if the cotton was taken from his possession against his will and was not in fact captured or abandoned.

2. In the admiralty an appeal supersedes altogether the decree of the court below, and the case is to be tried in the appellate court as if no decree had been passed in the court from which the appeal is taken.
[Cited in The Hesper. 122 U. S. 267, 7 Sup. Ct. 1182: The Philadelphian, 9 C. C. A. 54, 60 Fed. 426.]

3. Where the libellant claimed $27,000 and got a decree for $900 in the district court, and appealed, the circuit court being of opinion that the libellant ought to recover nothing, could dismiss the libel at libellant's costs, although no appeal had been taken by claimant from the decree of the district court.
[Cited in The Cassius, 41 Fed. 368.]

[Appeal from the district court of the United States for the district of Louisiana.]

This was an admiralty appeal. The case was this: The cotton was on the plantation of W. H. Gill, the claimant, in Red River county, Texas, who had an agent employed to guard it. In March, 1866, one Turnbull an agent of the treasury, had the cotton seized as captured or abandoned property and, against the protest of Gill, conveyed in wagons to Shreveport, Texas, and there stored. In April the master of the steamer Saratoga, against the express wishes of Gill, paid the charges on the cotton for transportation to Shreveport and for storage there amounting to $26,052.97, and took the cotton on board the steamer and conveyed it to New Orleans. The freight from Shreveport to New Orleans amounted to $1,095. Gill followed the cotton to New Orleans and recovered it. The owners of the Saratoga, however, filed this libel against the cotton, seeking a lien for the charges paid by them upon the cotton, and for the freight from Shreveport to New Orleans.

E. C. Billings and R. De Gray, for libellants.
S. R. Walker, for claimant.

---

[1] [Reported by Hon. William B. Woods. Circuit Judge, and here reprinted by permission.]

WOODS, Circuit Judge. The claimant by way of defense to the libel, answers: (1) That the cotton was shipped without his consent, but when he learned he could not prevent its shipment, he consented that it might be shipped, provided libellants would not pay the charges claimed thereon. (2) That the charges claimed to have been advanced, if they were in fact advanced, were incurred without the knowledge or consent of claimant. (3) That the cotton was forcibly and illegally and without consent of claimant, taken from the possession and plantation of claimant, in Red River county, Texas, and removed to Shreveport, La. (4) That libellants were notified by claimant before paying said charges that the cotton belonged to claimant, and not to pay the charges thereon because they were illegal and exorbitant, and were informed how the cotton was taken from claimant's possession.

The proof clearly establishes these facts: That the cotton claimed by Gill was his property, that it was taken forcibly and without his consent, and transported to Shreveport. There is an utter failure to show that the cotton was or ever had been in any manner or form the property of the Confederate States. It is difficult to see how one man can enter upon the premises of another, carry off his property against his will by force, and subject it to charges for carriage or storage, which the owner is compelled to pay. But it is claimed for libellants, that this property was seized by Turnbull, as treasury agent, under authority of section 1 of the act of March 12, 1863 (12 Stat. 820), and conveyed to Shreveport and thence to New Orleans by virtue of the 2d section of said act. The first section provides that the special agents of the treasury department shall receive and collect all abandoned or captured property, in any state or territory or any portion thereof, designated as in insurrection. Section 2 provides that the property so received and collected shall be forwarded to such place within the loyal states as the public interest may require. To authorize the seizure or transportation of this property by the agent of the treasury it must have been either abandoned or captured. This property was not abandoned, for it was on the premises of the owner, who was then present either by his agent or in person, claiming the property and protesting against its seizure or removal. It was not captured unless taken flagrante bello or surrendered as the property of the Confederate States at the close of the war. There is no proof that it ever was so captured or surrendered. We find, therefore, that after the actual close of the war, after hostilities had for sometime ceased, this property of the private citizen was taken forcibly from his possession, against his will, by a person having no claim, or color of a claim, to it: and who, to state his character in the mildest words the transaction will admit, was a naked trespasser. Such a trespasser could no more subject property to charges which the owner would be under obligation to pay, than if he had stolen it. The charges which the owner, when following up his property, can be required to pay, are such and such only, as he has agreed to pay.

I am unable to find any competent proof in this record to establish the promise of the claimant, to pay either charges or freight. Gill, in his deposition, denies that he made any promise to pay the freight. In his answer he says he did not wish to ship his cotton on the Saratoga, but finding that he could not prevent the shipping of it on the Saratoga, he consented that libellants should take the same, provided they would not pay the charges claimed thereon. He consented, therefore, on condition. That condition, if what libellants assert is true, was broken. They say they did pay these charges; they are now suing for their recovery. How then can Gill be held to his implied promise to pay freight, when the terms on which the promise was to be binding have not been kept? It is claimed that there is proof to show that Gill agreed to pay the warehouse charges of Griffin & Co., at Shreveport, amounting to $3,000. The only proof upon this point is found in the testimony of R. A. Phelps, who professes to give the contents of a letter from Gill to Dowty, master of the Saratoga, from which the promise may be implied. The letter is not produced, nor is any foundation laid for secondary evidence of its contents. The testimony was objected to. It is clearly incompetent, and the objection is sustained. This leaves the libellant without any proof whatever of a promise by Gill to pay any of these charges or freight. Without such promise there is no reason in law or equity why Gill should be required to pay any expenses incurred in transporting his cotton to New Orleans. It turns out that the wrong doers carried his property to a place where Gill could sell it to advantage. That is his good fortune. But suppose they had conveyed this cotton to some point where cotton was of no value, where there was no market, with what face could they ask him, on the recovery of his property. to pay the expenses incurred by them in the running away with it? Their right to do so would be just as clear in that case as this.

I am satisfied from an inspection of this record, that the cotton of claimant was not seized in good faith by the treasury agents. It was an attempt but too common in those times to take the property of the citizen, under the pretext of seizing it as government property, in order that it might be bought at a price below its real value. The persons engaged in this enterprise failed. They cannot charge the expenses of their unlawful acts upon the owner of the property, nor can any one who pays such expenses, either with or without notice of their unjust and unlawful character. be allowed to recover them of the owner of the property. This libel must be dismissed at the costs of libellant.

THE COURT having rendered this decision. proctors for libellants stated, that the district

court had rendered a decree in favor of libellants for $900 and costs of suit, that libellants only appealed from this decree, and the claimant not having appealed, the decree of the district court for $900 in favor of libellants must stand, and this court could not interfere with it.

WOODS, Circuit Judge. I think otherwise. When libellants appealed, the appeal opened the whole case. They cannot be allowed to claim the benefit of the decree below, and standing secure on that, try their fortunes in this court. In admiralty cases an appeal suspends the decree altogether. It is not res adjudicata until the final sentence of the appellate court is pronounced. The Roarer [Case No. 11,876]; Yeaton v. U. S., 5 Cranch [9 U. S.] 281. The cause in the appellate court is to be heard de novo as if no decree had been passed. We do not find these views opposed to the authorities cited by libellants. In fact, those authorities do not seem to touch the question at all. The libel, therefore, must be dismissed at the costs of the libellant. Decree accordingly.