## The Hesper.[1]

*(Circuit Court, E. D. Texas.* November, 1883.)

**1. Salvage.**

Where a ship was aground in the gulf of Mexico, near Galveston, and was pulled off by tugs, after being three days aground, and during those three days there was no wind nor sea of any danger to ships, large or small, and the services rendered in aiding her to get safely off were not attended with any hazard or danger, or any circumstances unusual to the towage and lighterage business as carried on in Galveston roads when the wind is moderate and the sea smooth, *held,* that the services rendered were salvage services, but of the lowest grade, involving neither risk of property, peril of life or limb, nor unusual expense, nor gallantry, courage, or heroism, and the same will be fully compensated by double compensation on the basis of towage and lighterage service.

**2. Salvage Award.**

Judgment of the district court reduced from $8,000 to $4,200. See *ante,* 692.

**3. Appeal in Admiralty.**

Where libelants appealed, the appeal opened the whole case. They cannot be allowed to claim the benefit of the decree below, and, standing secure on that, try their pretenses in this court.

*The Saratoga* v. 438 *Bales of Cotton,* 1 Woods, 75, followed.

Admiralty Appeal.

*Ballinger & Mott,* for libelants.

*Waul & Walker,* for claimants.

Pardee, J. This cause came on to be heard on the transcript and evidence, and was argued. Whereupon the court, being advised in the premises, finds the following as the facts of the case:

(1) That about 5:45 A. M. of the twelfth day of December, 1882, the steam-ship Hesper, bound on a voyage from Liverpool to Galveston, being out of her course, run aground, at the south-west side of Galveston island, about 20 miles south-west from Galveston, and nearly opposite the life-saving station. The Hesper was an iron propeller, and built in Hartlepool, England, in 1881, at a cost of £22,000. Her registered tonnage is, gross, 1,654 tons; net, 1,069 tons. Her freight capacity is 1,950 tons. She has powerful engines, of 750 horse-power, with steam windlasses and winches, and on said twelfth of December was well found and well manned in every respect. She was laden with a cargo of about 900 tons of salt.

(2) That when the Hesper went ashore her engines were slowed down, and she was making about four knots per hour. She struck easily, without shock, and remained upright. Her draught was then 13 feet 9 inches. The sea was smooth, and there was very little wind; what there was, was from the south; and the ship headed, when she struck, N. E. by N. Kedge anchors were immediately put out to the E. S. E., and efforts made to get the ship off in that direction, with the ship's engines heaving on those anchors. At the same time a message was sent overland to Galveston, the nearest port, to the ship's agent, to send assistance.

(3) That the agent of the ship applied to the agent of the tug Estelle, and procured that tug to go to the assistance of the Hesper. The Estelle was a long, narrow, deep boat, drawing about 8 feet 8 inches, and was the most powerful tow-boat in Galveston harbor, and had aboard the usual appliances of such boats. The Estelle reached the Hesper about 5 P. M. on the twelfth of December and reported. The master of the Hesper endeavored to bargain with

[1]Reported by Joseph P. Hornor, Esq., of the New Orleans bar.
Affirmed. See 7 Sup. Ct. Rep. 1177.

the master of the Estelle as to the cost of pulling the Hesper off, but the master of the Estelle refused to make any agreement on the ground that he did not know how much labor and time it would take. A line was then given to the Estelle from the stern of the Hesper, which was then more off the shore than the bow, and the Estelle hauled on said line for about two hours, during which time the crew of the Hesper, with some four or five hands from the life station, were throwing over cargo. No appreciable result came from this towing of the Estelle, and she desisted on the orders of the master of the Hesper.

(4) That in the mean time the sea, which had been smooth, with very little swell, had become more turbulent, and there was a very decided increase in the ground swell from the south-east; not so much, however, but that small boats were plying around the Hesper and life-boats were running easily to and from shore. At this time of stopping hauling by the Estelle, the master of the Hesper requested the Estelle to come along-side and run a heavy anchor out seaward from the Hesper, both to keep the Hesper from drifting further in, and for the Hesper to heave on to pull herself off. This the master of the Estelle refused to do, on the ground that there was too much sea on, and that he would thereby endanger his own boat; and thereupon the Estelle, taking aboard the Hesper's agent who had come overland, proceeded back to Galveston to procure more assistance. It was then found that the Estelle was making some water from a leak caused by a defect in the staff of the stuffing-box, which was not tight enough and was worked loose by the strain in hauling on the Hesper. However, the Estelle proceeded that night (of the 12th) to Galveston bar, where she laid until morning, reaching Galveston wharves about noon of the thirteenth of December. The Estelle lay at the wharves repairing until the morning of the fourteenth of December, when she took the schooner Clark, which had been engaged by the Hesper's agent to lighter cargo, in tow, and towed her down to the Hesper.

(5) That on the thirteenth of December the ship Hesper was lively, though still aground, shifting her position slightly, but not affecting her safety; some 450 tons of water having been pumped into her ballast tanks to put her down and keep her from going nearer inshore, and her crew being engaged in throwing over cargo while waiting for assistance. And on the same day the agent engaged the Buckthorn, a steam-lighter belonging to libelants, of lighter draught and power than the Estelle, to proceed to the Hesper, which she did, taking down a heavy anchor and cables, and two new hawsers, (the latter purchased by the Hesper's agent,) and a gang of men employed by the Hesper's agent to help lighter cargo and generally assist, and also provisions and other necessaries, arriving in the night and laying by until morning.

(6) That on the morning of the fourteenth of December the position and condition of the Hesper was much the same as on the preceding day, the weather being calm and the sea smooth. About 9 o'clock in the morning the gang of men brought down by the Buckthorn, after breakfasting aboard the Hesper, commenced to jettison cargo, and the Buckthorn carried out seaward and dropped the heavy anchor brought down from Galveston, in about 18 feet of water, connecting the same by hawsers and cables of about 210 fathoms in length, with the steam-winch of the Hesper. The Buckthorn then, also, took a line from the Hesper and pulled on her, while the machinery of the Hesper was heaving on the hawsers leading to the heavy anchor, but no relief was given. Towards noon of the 14th the Estelle arrived with the Clark in tow. The Clark was placed along-side of the Hesper, and cargo was transferred to her by the crew and the gang aforesaid. This lightering was kept up until about 4 o'clock in the afternoon, when about one-third of the cargo was removed, and nearly all her ballast water pumped out, and then the Estelle took

a line from the Buckthorn, and a general effort was made, by the Buckthorn, the Estelle, and the Hesper's engines, to get the Hesper off, which succeeded, whereupon the Hesper, which was uninjured, steamed to Galveston.

(7) Where the Hesper went aground the slope of the ground seaward is gradual and the bottom is sand.

(8) The prevailing and probable winds on that shore during the month of December are from the south and south-east, sometimes of great violence.

(9) During the three days the Hesper was aground there was no wind nor sea of any danger to ships, large or small, and the services rendered to the Hesper, aiding her to get safely off, were not attended with any hazard or danger, or any circumstances unusual to the towage and lighterage business as carried on in Galveston roads when the wind is moderate and the sea smooth.

(10) That the value of the Hesper, which was entirely uninjured by going ashore, was $100,000, and the value of her cargo saved was $6,500. The value of libelants' two boats, the tug Estelle and the lighter Buckthorn, was $35,000.

(11) That the Hesper, when aground as aforesaid, was in a condition of peril and distress; hardly likely to be able to get out of danger by her own efforts, even if the weather had been certain to continue favorable for many days, and certain to be wrecked if the weather should prove to be bad.

(12) That the services rendered the Hesper by libelants' boats, the Estelle and Buckthorn, were salvage services, but of the lowest grade, involving neither risk of property, peril of life or limb, nor unusual expense nor gallantry, courage or heroism, and the same will be fully compensated by double compensation on the basis of towage and lighterage services.

(13) The Estelle was engaged in these services three days and one night, and the Buckthorn two days and one night. The outside earnings of either of these boats, with their appliances, is $300 per day, which, allowing as much for night-work, would make the sum of $2,100 compensation, and double compensation is the sum of $4,200.

And the court finds the following as conclusions of law:

(1) The services rendered by the libelants' boats, the Estelle and the Buckthorn, and their respective masters and crews, were salvage services of the lowest grade.

(2) That the court should award for said services the sum of $4,200.

(3) That libelants should have judgment for the sum of $4,200, and costs incurred in the district court.

(4) That the libelants should pay the costs of this court.

The decision of the district judge in this case, found in the record, is a clear exposition of the law of salvage, and but for additional evidence and new points argued would be all that need be said to explain the views held in this case. Proctor for respondents in this case admits in argument that by reason of the service of the extra anchor furnished by the libelants, the service amounts to salvage service. But for this admission I have grave doubts whether I could have found as a fact that the services ranked above towage and lighterage service, to be compensated on the principle of a *quantum meruit*. But salvage services being taken as established, the question is one solely of amount. As a fact in the case, I have found that there was neither risk of property, peril of life or limb, nor unusual expense nor gallantry, courage or heroism. The evidence shows there was no

enterprise in going out in tempestuous weather, as the weather was moderate and the libelants' tug only went out when called upon and employed so to do. The labor and skill furnished were of the ordinary kind, such as libelants' boats were seeking as ordinary employment. Salvage, then, is to be determined entirely by the distress in which the salved property was. The distress of the Hesper was the salvors' opportunity, and the amount of salvage, on this point, determines the whole case.

Various points were urged in argument to increase the salvage,— that the wreckage service should be encouraged; that storms might have come that would have destroyed the vessel; that the salving tug injured herself in tugging at the ship salved, etc. It is true that all encouragement should be given to mariners, ships, and landsmen to save property imperiled on the high seas, but where there is no chance for the exercise of gallantry, heroism, or risk, why should an already distressed and imperiled ship be subject to pay additional expenses for ordinary services, and these expenses be chargeable solely to her calamity? That storms might have come is true, but, from the fact, I am unable to see why a distressed vessel should pay money to those boats that can, of their own volition, seek safety. The salving-tug Estelle, in this case, was not injured by collision, nor in any way, except by strain, in exerting her own strength in plenty of water. Her owner says that "the staff of the stuffing-box, over the trench which the staff passes through, the engineer did not have it tight enough, and it was soon too long," (whatever that may mean,) was the difficulty, and seems to be unseaworthiness. It is difficult for the court to see why a salved vessel should be compelled to pay, in addition to ordinary salvage, repairs for unseaworthy crafts that may come to her assistance. The injury to the Estelle was incurred while she was performing ordinary services, and was likely to happen at any time she was employed in her ordinary duties. As the decree allows her double compensation for the time she was undergoing repairs, her owners ought to be satisfied.

As the district court allowed the respondents a certain sum for salvage, and as the claimants, although giving notice of appeal, did not appeal, I entertained some doubts as to whether the amount of salvage so allowed could be reduced in this court. Although the authorities are somewhat contradictory, I have concluded to follow the precedent established in this circuit by Justice Woods in *The Saratoga* v. *438 Bales of Cotton*: "Where libelants appealed, the appeal opened the whole case. They cannot be allowed to claim the benefit of the decree below, and, standing secure on that, try their fortunes in this court." 1 Woods, 75.