THE SAN RAFAEL. THE SAUSALITO. In re NORTH PAC. COAST R. CO. NORTH PAC. COAST R. CO. v. HALL et al. (two cases). NORTH SHORE R. CO. v. McCUE.

(Circuit Court of Appeals, Ninth Circuit. October 16, 1905.)

Nos. 1,175, 1,176, 1,177.

1. ADMIRALTY—APPEAL—MATTERS REVIEWABLE.
   An appeal in admiralty by either party from the District Court to the Circuit Court of Appeals vacates altogether the decree of the District Court and opens the whole case for trial anew in the appellate court.
   [Ed. Note.—For cases in point, see vol. 1, Cent. Dig. Admiralty, §§ 748, 759.
   New proofs in admiralty, see notes to The Venezuela, 3 C. C. A. 322.]

2. SHIPPING—PROCEEDINGS FOR LIMITATION OF LIABILITY—SCOPE.
   The purpose of proceedings for limitation of liability for a collision is to exempt the petitioner from all personal liability on account of the collision, on whatever ground it may rest; and where the petition is for the limitation of liability as owner of a vessel sunk, but it is found on the hearing, on appropriate allegations in the answer, that petitioner was also owner of the other vessel concerned, and that both were in fault for the collision, it is a condition precedent to the granting of the relief sought that both vessels and their pending freight be surrendered.
   [Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 654.
   Limitation of shipowner's liability, see note to The Longfellow, 45 C. C. A. 387.]

3. COLLISION—STEAM VESSELS MEETING IN FOG—ERRONEOUS SIGNALS.
   Two meeting ferry steamers both *held* in fault for a collision in the Bay of San Francisco; one on the ground that she gave a passing signal which required the vessels to cross each other's course in a fog so dense that they could not see each other, and the other for assenting to such signal and attempting to carry it into effect.
   [Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 40.]

4. DEATH—EVIDENCE TO ESTABLISH.

Libelants, consisting of an insane woman and her seven minor children, by their guardian ad litem, sued to recover damages for the death of the husband and father. At the time of the alleged death the mother was confined in an asylum, and the children, the oldest of whom was 17 and the youngest 3 years of age, resided with their father, who supported them and was uniformly kind and affectionate toward them. He was also a man of good habits. He left home, expressing the intention of going to San Francisco, and from there, on a boat which left at a certain hour, to San Rafael, where he intended to stay overnight with his brother-in-law, and to go the next day to visit his wife. He rode as far as Oakland with an acquaintance, who saw him leave there on a ferry-boat which reached San Francisco in time to make the expected connection; but he was never seen or heard from afterwards by any one who knew him. The San Rafael boat which he intended to take was sunk on the trip in a collision in a fog. A man answering his description was seen by other passengers on such boat immediately before the collision, seated in the restaurant at a place from which it was doubtful if he could have escaped after the collision. Held, that such evidence was sufficient to warrant a finding of his death and that it was due to the collision, although but three years had elapsed at the time of the trial.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, §§ 5, 6.]

5. SAME—DAMAGES.

An award of $5,000 damages in a suit in admiralty for the death of a man who left an insane wife and seven minor children, all of whom were dependent on him for support, the oldest child being 17 and the youngest 3 years of age, held too small, and increased to $7,500.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, §§ 120–124.]

6. EVIDENCE—DECLARATIONS—STATEMENTS SHOWING INTENTION.

Whenever the intention of a person is of itself a distinct and material fact in a chain of circumstances, as where it is sought to prove by circumstantial evidence that a person who has not since been seen or heard from was a passenger on a vessel when she was sunk in collision, and so lost his life, and as one of the circumstances that he intended to take such vessel, such intention may be proved by his oral declarations made contemporaneously.

[Ed. Note.— For cases in point, see vol. 15, Cent. Dig. Death, § 4; vol. 20, Cent. Dig. Evidence, §§ 1063, 1064.]

7. ADMIRALTY—MISJOINDER OF DEFENDANTS—AMENDMENT OF LIBEL.

Where exceptions to a libel against a vessel and its owner were sustained, on the ground that they could not be sued jointly, it was not error to permit the libel to be so amended as to declare against the vessel alone.

[Ed. Note.—For cases in point, see vol. 1 Cent. Dig. Admiralty, §§ 289, 295, 524.]

8. MARITIME LIENS—ENFORCEMENT—LIMITATION BY STATE STATUTE.

A state statute limiting the time within which liens on vessels given thereby must be enforced does not restrict or affect the jurisdiction of a court of admiralty to enforce a lien given by the general maritime law.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Maritime Liens, § 99.]

9. SAME—TORTS—SALE OF VESSEL TO BONA FIDE PURCHASER.

A lien for a maritime tort follows the vessel into the hands of even a bona fide purchaser.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Maritime Liens, § 86.]

10. COLLISION—PERSONAL INJURIES—DAMAGES.

An award of $1,000 damages for personal injuries received in a collision by which libelant's arm was broken and his hands mutilated and

partially disabled, a part of one of his ears was cut off, and he was rendered permanently deaf in one ear, besides receiving other injuries, *held* too small, and increased to $4,500.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Damages, § 372.]

Appeals from the District Court of the United States for the Northern District of California.

For opinion below, see 134 Fed. 749. ·

These appeals grew out of the same accident, and ·were argued and submitted together; the cause being a collision in the Bay of San Francisco between the ferry steamers Sausalito and San Rafael, by which the latter was sent to the bottom of the bay, where she has ever since remained a total wreck. Both steamers were owned and operated at the time by the North Pacific Coast Railroad Company, in connection with its railroad, for the transportation of its passengers and freight between the city of San Francisco and the Sausalito terminus of its road. The accident occurred on the 30th day of November, 1901. On the 17th day of September, 1903, that company filed in the court below its verified petition, by which it sought, not only to obtain a limitation of its liability, under and pursuant to the provisions of Act Cong. March 3, 1851, c. 43, 9 Stat. 635, subsequently substantially incorporated into Rev. St. §§ 4282–4290 [U. S. Comp. St. 1901, pp. 2943–2948], but to obtain a decree relieving it of any liability by reason of the matters and things alleged in its petition. It was therein alleged, among other things, that most of the passengers upon the San Rafael were rescued and saved; that "all or most" of the merchandise, personal property, baggage, and effects were lost, and that nothing remained of the steamer San Rafael but four of her iron boats, the aggregate value of which did not exceed $400; that at the time of the collision and of the wrecking of the San Rafael the amount of her "freight pending was $40.98, that is, $3.48 prepaid freight, and $37.50 prepaid passage money," and no more; that the value of the San Rafael and her freight pending "immediately upon, at, and after the happening of the misfortune aforesaid, did not and does not exceed the sum of $440.98." The petition also alleged that one J. S. McCue had commenced an action in the superior court of the city and county of San Francisco against the petitioner to recover from it damages in the sum of $300,000 for injuries alleged to have been sustained by him while a passenger on the San Rafael at the time of the collision, and had also commenced an action in the superior court of Marin county, Cal., against the petitioner to recover damages in the sum of $500 for merchandise alleged to have been lost by him by reason of the collision, and that various other persons, claiming to be similarly injured and damaged, will or may bring similar demands against the petitioner. The petition contained the usual prayer, and on the 21st day of December, 1903, a bond for the appraised value of the San Rafael and her freight pending was filed, and on the same day an injunction and monition were issued, the latter of which was returned into court showing due publication.

On the 5th day of April, 1904, the widow and children of one Alexander Hall, by Patrick Cassidy, their guardian ad litem, appeared as claimants, and, without waiving their right to contest the sufficiency of the petition in point of law as well as fact, alleged, among other things, that Alexander Hall was one of the petitioner's passengers on board the San Rafael at the time of the collision in question, which collision they alleged was caused by the gross carelessness of the petitioner, its servants and employés, in so navigating the two steamers as to bring them together, resulting in the sinking of the San Rafael and the death of Hall, for which damages were asked in behalf of his widow and children in the sum of $50,000.

On the 6th day of April, 1904, J. S. McCue filed in the court below a paper entitled "Exceptions and Objections of J. S. McCue," concluding with a prayer that the court deny and dismiss the petition, which paper the court treated as an answer thereto. At the same time McCue filed a claim against the petitioner for the sum of $300,000 as damages alleged to have been sustained by him in the collision, in which he alleged, in substance, that he was a passenger of the petitioner on board its steamer San Rafael at the time in

question, on one of her trips from San Francisco to Sausalito, during which time the petitioner's other steamer Sausalito, was making one of her trips from Sausalito to San Francisco, when, near Alcatraz Island, the San Rafael was run into by the Sausalito, through the gross carelessness of the officers of each of the boats, by which collision the San Rafael was sunk, and the claimant seriously injured in the particulars therein specifically set forth, for which injuries he demanded damages in the sum of $300,000. In his "Exceptions and Objections" to the petition McCue alleged, among other things, substantially the same facts, and also set up in defense of the petition that, inasmuch as the collision which inflicted his injuries was brought about by the fault of both steamers and their respective masters, the petitioner was not entitled to any limitation of its liability without the surrender of both steamers, and accordingly prayed that the petition be denied and dismissed. This point on the part of McCue was overruled by the court below, the court saying, in its opinion: "It is a sufficient answer to this to say that the petitioner does not seek to limit any liability which it may be under as owner of the steamer Sausalito, and in my opinion the right of the respondent, or any other person injured by the collision referred to, to proceed against the steamer Sausalito, or the petitioner, in so far as that vessel is liable for damages growing out of such collision, is not affected by this proceeding. The petitioner does not allege that it is the owner or has ever been the owner of the steamer Sausalito, and the decree in this case will be restricted to its liability as owner of the steamer San Rafael. There was no evidence given upon the trial bearing upon the allegation of the petition that the collision was the result of inevitable accident. The claim of the petitioner for exemption from all liability must therefore be denied, and a decree entered limiting its liability to the appraised value of the San Rafael and freight pending. Further hearing of the case upon the question of the amount of damages may be brought on by either party, upon notice to the other." In accordance with this conclusion, the court below entered a decree, on the 2d day of November, 1904, adjudging and decreeing "that the default of each person and all persons who may claim to have suffered damages or loss on said voyage or resulting from said collision, and who have not heretofore presented his or their claims herein pursuant to said monition aforesaid, be, and are hereby, adjudged herein to be forever barred; that the petitioner North Pacific Coast Railroad Company, a corporation, is entitled to limit its liability as owner of the steamer San Rafael, if any liability there be, for and on account of the matters and things in its said petition alleged; and that the claim of petitioner for exemption from all liability is denied, and its liability as owner of the steamer San Rafael be, and the same is hereby, limited to the appraised value of the said steamer San Rafael, with its freight pending, hereby adjudged to be the sum of $425.23, together with interest thereon. from December 21, 1903; and that the further hearing as to the amount of damages may be brought on upon notice by either party; and that such matters as are not herein specifically adjudged, be and are reserved for further hearing and consideration."

Further hearing in respect to the matter of damages was subsequently brought on, resulting in findings by the court below made and entered December 16, 1904, to the effect that the collision in question was caused by the fault of both steamers and their respective officers, and that McCue had sustained damages by the collision to the extent of $1,500, and that the widow and children of Alexander Hall had been damaged by the death of the latter in the sum of $5,000, upon which findings there was entered, on the 5th day of January, 1905, a decree in favor of McCue against the petitioner in the sum of $1,500, with costs, but with a limitation to the effect that satisfaction of the decree should "be limited to such portion of the sum of four hundred twenty-five and twenty-three one-hundredths (425 23-100) dollars, together with interest thereon from December 21, 1903, as may be on the further proceedings herein apportioned to said J. S. McCue, upon a consideration of all judgments or decrees rendered against said petitioner herein," and further adjudging "that the full limit of the liability of said petitioner, as owner of said steamer San Rafael, for or on account of any matter or thing alleged

141 F.—18

in said petition, is hereby limited to the said sum and value of four hundred twenty-five and twenty-three one-hundredths (425 23-100) dollars, together with interest thereon from December 21, 1903, until the said sum and interest shall, upon the proper order of this court therefor, be paid into the register of this court." A similar decree, with similar limitations and provisions, was at the same time entered by the court below in favor of Cassidy, as guardian ad litem of the widow and children of Alexander Hall, against the petitioner North Pacific Coast Railroad Company, for $5,000. Meanwhile, to wit, on the 21st day of November, 1903, McCue brought in the same court a libel against the steamer Sausalito and the North Shore Railroad Company, which had then become the owner of the steamer, having acquired the same from the North Pacific Coast Railroad Company, in which libel McCue set up substantially the same matters which he alleged in his former pleadings, exceptions to which, upon the ground that the libelant could not proceed against the steamer and its owner jointly, were sustained by the court on January 13, 1904, with leave to the libelant to amend.

Accordingly, on the 18th day of January, 1904, McCue filed an amended libel against the steamer Sausalito, alleging the same facts previously set up, and praying damages in the sum of $300,000 against that steamer, and that she be sold to pay the same, etc. The answer of the North Shore Railroad Company, then claimant of the Sausalito, to the amended libel of McCue, besides putting in issue the averments with respect to negligence on the part of the steamer Sausalito, and with respect to his injuries and damages, set up, in bar thereof, the limited liability proceedings heretofore referred to, and the decrees entered therein. On the 30th of November, 1903, Cassidy, as guardian ad litem of the widow, and children of Alexander Hall, also brought in the court below a libel against the steamer Sausalito and the North Pacific Coast Railroad Company, as the owner thereof, to recover damages for the alleged death of Alexander Hall, alleging therein the same facts he had theretofore set up as grounds for such recovery, in which proceeding the North Shore Railroad Company intervened as claimant of the steamer Sausalito. Exceptions were filed by both of the railroad companies to that libel, which were, by the court below, sustained, on the ground that the steamer and its owner could not be so proceeded against jointly, whereupon an amended libel was, by leave of the court, filed by Cassidy, as such guardian, against the North Pacific Coast Railroad Company alone, based upon substantially the same averments as he had made in his former pleadings herein referred to.

The libels of McCue and of Cassidy, as guardian ad litem of the widow and children of Alexander Hall, were tried together and submitted upon the same evidence, resulting in findings by the court below to the effect that both Hall and McCue were passengers of the North Pacific Coast Railroad Company, on board the steamer San Rafael at the time of the collision between her and the steamer Sausalito, that Hall lost his life by reason of it, and that McCue lost, from the same cause, personal effects of the value of about $400, and suffered personal injuries to such an extent as to make his damages aggregate $1,500, and further finding that the collision was brought about by the fault and carelessness on the part of both steamers and of their respective masters, the court gave judgment in favor of McCue for $1,500 and costs, but further adjudged that the decree "be satisfied upon the payment of said sums, less any amount paid to the libelant upon a decree heretofore rendered in his favor in the matter of the petition of the North Pacific Coast Railroad Company for limitation of its liability, filed in this court and numbered 13,112," and further adjudging "that unless this decree be satisfied as above provided, or proceedings thereon be stayed by an appeal from said decree within the time limited and prescribed by the rules and practice of this court, that then the libelant may have execution against said claimant and against its surety, upon the admiralty stipulation given in the above-entitled proceeding for the release of said steamer Sausalito," from which decree the claimant appealed. And the court gave judgment in the case of Cassidy, as guardian ad litem of the widow and children of Alexander Hall, against the North Pacific Coast Railroad Company for $5,000 and costs, but further adjudged that the decree "be satisfied upon payment of the sum so

awarded, less any amount which may be paid to the libelants, upon the decree heretofore rendered in their favor in the matter of the petition of the North Pacific Coast Railroad Company for a limitation of its liability, filed in this court, and numbered 13,112," and that "each of said libelants, to wit, Catherine Hall, Robert A. Hall, Maggie J. Hall, Mary C. Hall, Lillie A. Hall, Alexander M. Hall, Teresa R. Hall, and Cecelia L. Hall, shall share equally in said sum so decreed," and further adjudged "that unless this decree be satisfied as above provided, or proceedings thereon be stayed, on an appeal taken from this decree, within the time therefor limited and prescribed by the rules and practice of this court, that then the libelants may have execution against said respondent, the North Pacific Coast Railroad Company, to enforce satisfaction of this decree, or so much thereof·as shall remain unsatisfied," from which decree the North Pacific Coast Railroad Company appealed.

George W. Towle and William W. Deamer, for appellants.

H. V. Morehouse, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge, after making the foregoing statement of the cases, delivered the opinion of the court.

It is well settled, said the Supreme Court in Irvine v. The Hesper, 122 U. S. 256, 266, 7 Sup. Ct. 1177, 30 L. Ed. 1175, "that an appeal in admiralty from the District Court to the Circuit Court vacates altogether the decree of the District Court, and that the case is tried de novo in the Circuit Court. Yeaton v. United States, 5 Cranch, 281, 3 L. Ed. 101; Anonymous, 1 Gall. 22, Fed. Cas. No. 444; The Roarer, 1 Blatchf. 1, Fed. Cas. No. 11,876; The Saratoga v. 438 Bales of Cotton, 1 Woods, 75, Fed. Cas. No. 12,356; The Lucille, 19 Wall. 73, 22 L. Ed. 64; The Charles Morgan, 115 U. S. 69, 75, 5 Sup. Ct. 1172, 29 L. Ed. 316. We do not think that the fact that the claimants did not appeal from the decree of the District Court alters the rule. When the libelants appealed, they did so in view of the rule, and took the risk of the result of a trial of the case de novo. The whole case was opened by their appeal, as much as it would have been if both parties had appealed, or if the appeal had been taken only by the claimants." The same rule applies here, since this court now has the jurisdiction of appeals in admiralty from the District Court that formerly appertained to the Circuit Court. The Sirius, 54 Fed. 188, 194, 4 C. C. A. 273. The whole of the cases in hand, therefore, were opened by the appeals taken by the petitioner and claimants. It is unimportant that no appeal was taken by McCue, or by the guardian of the widow and children of Alexander Hall, and we must make such disposition of the cases as the records before us show to be proper.

First, then, as to the petition filed by the North Pacific Coast Railroad Company for the limitation of its liability, in the event any should be found to exist. McCue set up in defense of that proceeding, that the collision that inflicted the injuries upon him was caused by negligence on the part of each of the steamers San Rafael and Sausalito; and the court below so found from the evidence. Yet that court overruled the point thus made on behalf of McCue, holding then, as later upon the trial, that as the steamer Sausalito was not mentioned in the petition,

the petitioner was entitled to a limitation of its liability in respect to the steamer that was mentioned therein, namely, the San Rafael. In this there was clear error, for, as said by the appellant's own proctor:

"The purpose of the limitation proceeding was to limit the liability of the North Pacific Coast Railroad Company—alleged by libelant to be the owner of both steamers—as to any and all of its liabilities resulting from a collision between the steamers San Rafael and Sausalito."

And it is for that very reason that it is a condition precedent to the granting of such relief that the party seeking it surrender each and every vessel participating in the tort. It was so distinctly adjudged by this court in the case of The Columbia, 73 Fed. 226, 19 C. C. A. 436. And if it be true, as the court below held, that the evidence shows the fact to be that the collision in question was caused by negligence on the part of each of the steamers, it follows, as a matter of course, that the petition should be denied and dismissed; from which it must further follow that there can be no bar or limitation to whatever rights the libelants may have, by reason of those proceedings, or of any judgment entered therein. All parties concede that there was fault on the part of the San Rafael. And in respect to the question of negligence on the part of the Sausalito, we agree with what was said by the court below in one of its opinions, to wit:

"The facts relating to the collision between the San Rafael and Sausalito, and which the libelant insists show negligence upon the part of the servants of the defendant, in the navigation of both steamers, may be very briefly stated: The San Rafael left San Francisco for Sausalito about the hour of 6:15, on the evening of November 30, 1901, and the Sausalito left the town of Sausalito for San Francisco at about the same time. The night was dark, and the fog very thick. Just after passing Alcatraz Island, the master of the Sausalito heard the fog whistle of the San Rafael, from ½ to 1 point off his port bow, and shortly thereafter the San Rafael sounded two whistles, indicating that she was going to port. The Sausalito answered with two whistles, and the wheel of the Sausalito was immediately put hard astarboard, for the purpose of changing her course to port. The master of the Sausalito testified in substance that he knew the San Rafael was in error in giving the passing signal to port, and that, after answering the same, he at once gave orders to his engineer to stop, and back his vessel, and, at the same time, gave three blasts of his whistle to notify the other steamer that his engines were reversed. The engines of the San Rafael were also reversed about the same time, and within a very short time thereafter, not more than 2 minutes, the collision occurred, the bow of the Sausalito striking the San Rafael an angling blow on her starboard side, and injuring her to such an extent that she sank in 20 minutes, and became a total loss. The evidence also shows that, just prior to the collision, the Sausalito had swung to port one point. There was a strong ebb tide pressing against the side of the San Rafael at the time, and the defendant claims that the Sausalito was not under headway, and the collision was caused solely by the drifting of the San Rafael upon the Sausalito. In the view I take of the case, it is not necessary to determine whether this claim is sustained by the evidence or not. My conclusion from all of the evidence is that the collision was caused by the mutual fault of the steamers, in attempting to cross courses in a dense fog, when neither could see the other in time to avoid a collision. It is true the first error was committed by the San Rafael, but it was certainly an error upon the part of the Sausalito to assent to the San Rafael's proposed change of course, and to starboard her wheel for the purpose of passing to port; and the evidence does not satisfy me that the effect of this error was rendered harmless by the subsequent action of the Sausalito, in stopping and reversing her engines. She had swung to port one point, and

her wheel was still hard astarboard at the time of the collision; and in my opinion, in thus changing her course, she contributed to the cause of the collision."

It results, from what has been said, that neither the libel of McCue against the steamer Sausalito, nor that of Cassidy, as guardian of the widow and children of Alexander Hall, against the North Pacific Coast Railroad Company, can be in any way affected by the limitation proceedings, nor by any judgment entered therein.

There remain for consideration and determination, in respect to the libel brought on behalf of the widow and children of Alexander Hall, only the questions of the sufficiency of the evidence to show that the latter lost his life by reason of the collision, while a passenger on board the steamer San Rafael, whether the sum of $5,000 awarded by the court below was a just compensation for such loss, and the propriety of the distribution of that award made by the court below between the widow and children. In respect to the libel brought by McCue against the steamer Sausalito, there remain for consideration and determination: (1) The point made on behalf of the claimant of the steamer to the effect that the court below erred in allowing the libelant to so amend his libel as to proceed against that steamer alone; (2) that it erred in not holding McCue's cause of action barred by the provisions of section 813 of the Code of Civil Procedure of California, and by the laches of the libelant; and (3) the question of the amount of damages to which the libelant McCue is justly entitled.

As regards Alexander Hall, it is true that there is no direct and positive evidence that he lost his life by reason of the collision in question, nor that he was a passenger on the San Rafael at the time. The case, in that respect, rests upon certain facts and circumstances from which the court below drew the inference that he was such passenger, and went down with that vessel. The evidence shows that Hall resided near Sacramento with his family of seven minor children, the oldest of whom was then but 17, and the youngest but 3 years of age. His wife was insane, and was then confined in a sanitarium at Livermore. A brother of hers, the guardian ad litem here, was residing at San Rafael. The oldest child, a boy then about 17 years of age, and about 20 at the time of the trial, when asked about his father's habits, testified:

"He was a good father, as far as he treated all of us children. He was always home with us. We were without a mother, and he was always at home, treated us well, and was always with us. He was not a man of bad habits, staying out, or nothing like that—always affectionate to his family."

There is nothing to the contrary in any of the testimony. It appears that on November 30, 1901 (the day of the accident), Alexander Hall left Sacramento for the purpose of first going to San Rafael, to spend the night with his brother-in-law, Cassidy, and of going the next day to Livermore, to see his unfortunate wife—having taken care to see that the train on which he left Sacramento was scheduled to connect with the Oakland boat that would bring him to San Francisco in time to take the 6:20 boat to San Rafael. There is testimony to the effect that, before leaving Sacramento, Hall stated, not only to his son Robert, but to an acquaintance, Hallorn, whom he had known for many years,

that he was going to San Rafael that night to see his brother-in-law, and the next morning to Livermore to see his wife. From Sacramento to Oakland he rode in the same seat with another acquaintance by the name of Kenny, to whom he told the same thing, and when the train reached the Oakland Mole, which it appears that it did a little after 5 p. m., Hall and Kenny went together upon the ferry steamer Berkeley, bound for San Francisco, but it was so foggy that Kenny concluded to get off, that witness saying:

"It being so foggy, I got off the boat and got to the cars as fast as I could, and got on the cars; and just as I got off, the boat pulled away, to make the trip to San Francisco."

The witness, being further asked if he saw Hall go aboard the Berkeley, answered:

"Yes, sir; I shook hands with him. I said, 'Sandy, I will not go along; it is too foggy,' and I got off, just as the boys got the rope off."

This was in ample time for Hall to have reached San Francisco and taken the steamer San Rafael on her 6 :20 trip, which was the fatal one.

By several witnesses, Hall was described as being from 5 feet 10½ inches to 6 feet tall, stoop-shouldered, with sandy complexion, and a heavy sandy mustache. Hallorn testified that he wore "a black soft hat, with a brown overcoat, tending to be turning a little bit white; that is, the material was brown, but it had faded, and was turning white. It was an overcoat that I had known him to have for three or four years." On the trial, it was admitted that Judge Lennon, of the superior court of Marin county, would, if present, testify that he "was on the San Rafael at the time of this collision; that he was in the restaurant just immediately preceding the collision, where he saw Mr. McCue, and at another table were sitting two gentlemen, one of whom was quite a tall man, with a soft Stetson hat, sandy complected, with a sandy mustache, and, to the best of his recollection, a light appearing overcoat." McCue testified that he saw two men sitting in the restaurant on the boat, "over at this counter near the stove—near the cook's range," and that "one of whom was a tall man, sandy complected; the other appeared to be a stout-built man." Being asked to state the position of these men "as to their ability to get out of there after the accident," the witness answered:

"From the way the boat laid on the other boat, there was only one place for them. If they were not knocked out in front of the boat when the accident occurred, they must have been under the boat."

The evidence shows that Hall has never been seen or heard of or from since the accident, and, although at the time of the trial seven years had not elapsed, but only about three—from which fact no presumption of his death could be indulged in, but on the contrary, the presumption that he was still alive—yet, "if it appears in evidence that the absent person, within the seven years, encountered some specific peril, or within that period came within the range of some impending or immediate danger, which might reasonably be expected to destroy life, the court or jury may infer that life ceased before the expiration of the seven years." Davie v. Briggs, 97 U. S. 628, 634, 24 L. Ed. 1086.

The question is one of fact to be determined on all relevant facts and circumstances disclosed by the evidence, and the inference of death may arise from disappearance under circumstances inconsistent with a continuation of life. Fidelity Mutual Life Ass'n v. Mettler, 185 U. S. 308, 22 Sup. Ct. 662, 46 L. Ed. 922, which case will be found an instructive one on the subject. It is certainly highly inconsistent with the continuation of the life of Alexander Hall that he should have suddenly deserted, and thereafter kept in utter ignorance of his existence, his family of minor children, all of whom were dependent upon him, and to whom, the evidence shows, without conflict, he had been habitually kind and affectionate. He was, according to the evidence, a man of good habits, staying closely at home, and not only looking carefully after the welfare of his young and dependent children, but also after the needs of his unfortunate wife. The sudden and continued disappearance of such a man, under such circumstances, is entirely inconsistent with the continuation of his life; and the inference of his death therefrom is greatly strengthened by the facts that he left his home with the declared intention of going to San Rafael to spend the night with his brother-in-law, on his way to see his wife; that, when last identified, he was carrying out that intention by going from Sacramento to the Oakland Mole and there getting on the ferryboat bound for San Francisco, in ample time to have taken the steamer San Rafael for the city of San Rafael on her fatal trip; and by the further fact that a man answering his description quite closely was seen on board that steamer just prior to the collision, and was never seen at any time after she sank. We are of the opinion that the court below was right in its conclusion that Alexander Hall was a passenger on the steamer San Rafael, and met his death by reason of the collision between her and the steamer Sausalito. To do so is not, as contended by the proctor for the appellant, basing presumption upon presumption, but it is the drawing of the proper and logical inference from all the facts and circumstances disclosed by the evidence in the case.

The objections on the part of the appellant to the declarations of Hall in respect to his intention to go to San Rafael, are not well taken. "Whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party. The existence of a particular intention in a certain person at a certain time being a material fact to be proved, evidence that he expressed that intention at that time is as direct evidence of the fact as his own testimony that he then had that intention would be. After his death there can hardly be any other way of proving it." Mutual Life Ins. Co. v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706. See, also, Insurance Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437; Shailer v. Bumstead, 99 Mass. 120.

We therefore not only think that the court below was right in awarding the libelant Cassidy, as guardian, judgment for the death of Alexander Hall, but are of the opinion that the amount of damages allowed by the court below therefor—$5,000—is too small. That amount should and must be increased to $7,500, which sum should, in view of the circumstances and condition of the widow, and the condition and ages of the

children, be, in our opinion, distributed as follows: To the widow, Catherine Hall, $2,500; to Robert A. Hall, $419; to Maggie J. Hall, $503; to Mary C. Hall, $588; to Lillie A. Hall, $672; to Alexander M. Hall, $789; to Teresa R. Hall, $926; and to Cecelia L. Hall, $1,103.

There is no merit in the suggestion that the court below erred in allowing the libelant McCue to so amend his libel as to proceed against the steamer Sausalito alone. Newell v. Norton, 70 U. S. 257, 18 L. Ed. 271; The Mabey, 77 U. S. 420, 19 L. Ed. 963; O'Connell v. 1002 Bales of Hemp (D. C.) 75 Fed. 408; Benedict's Admiralty (3d Ed.) §§ 483-485, 488.

Nor is there any merit in the point that the court erred in not holding McCue's libel barred by the provisions of section 813 of the Code of Civil Procedure of California, and by laches. Section 813 of the California Code of Procedure declares that "all steamers, vessels, and boats are liable" for certain specified services, supplies, etc., and "(5) for nonperformance or malperformance of any contract for the transportation of persons or property between places within this state, made by their respective owners, masters, agents, or consignees; (6) for injuries committed by them to persons or property in this state," and further declares that "demands for these several causes constitute liens upon all steamers, vessels, and boats, and have priority in their order herein enumerated, and have preference over all other demands; but such liens only continue in force for the period of one year from the time the cause of action accrued."

Courts of admiralty do not get their jurisdiction from state statutes. Roach v. Chapman, 63 U. S. 129, 16 L. Ed. 291; 19 Am. & Eng. Enc. Law, p. 1084. That state Legislatures cannot restrict or extend the admiralty jurisdiction exclusively vested in the federal courts, said the court in the case of The H. E. Willard (D. C.) 53 Fed. 600, "has been often decided and conclusively settled. * * * It follows, necessarily, that a lien given by a state statute is not the test of jurisdiction. If it were, a state Legislature might at pleasure modify the jurisdiction of the courts of admiralty by creating or abrogating liens not given by the maritime law." The lien sought to be enforced in the present case is one given by the general maritime law, and is within the exclusive jurisdiction of the federal court, and to be governed by the rules and principles here applicable. The Moses Taylor, 71 U. S. 411, 18 L. Ed. 397.

It is true that when there is nothing exceptional in the case, courts of admiralty govern themselves by the analogies of common-law limitation. The Queen (D. C.) 78 Fed. 155. In the present case, the injury out of which the lien sought to be enforced arose did not accrue until November 30, 1901, and McCue's libel was filed January 21, 1903—within two years thereafter. If, therefore, by way of analogy, we look to the California statute, we find a period of two years there prescribed within which an action for damages for such injuries as were suffered by the libelant may be brought. Code Civ. Proc. Cal. § 339. But the case shows that McCue was prompt in bringing suit for the damages sustained by him. Before the filing of the petition by the North Pacific Coast Railroad Company in the court below for the limitation of its

liability, he had commenced two suits in the courts of the state to recover such damages—one for the personal injuries sustained by him, and the other for the loss of his property. Indeed, the existence of those suits was made the basis, in part, of the petitioner's application for the limitation of its liability; and the prosecution of those suits in the state courts was stayed by the court below by process issued in those proceedings. And in those proceedings McCue was also prompt to assert his claim for the damages sustained by him. There is, therefore, no just ground for the assertion of laches against this libelant.

Equally without merit is the suggestion that the enforcement of the lien against the steamer Sausalito would work a wrong upon an innocent purchaser. In the first place, the lien for a maritime tort, according to the maritime law, accompanies the vessel into the hands of even a bona fide purchaser. Vandewater v. Mills, 60 U. S. 89, 15 L. Ed. 554; The Rock Island Bridge, 73 U. S. 215, 18 L. Ed. 753; The Avon, Fed. Cas. No. 680; Bruce v. The American, Fed. Cas. No. 2,046; 19 Am. & Eng. Enc. Law, pp. 1082–1117. In the next place, the claimant North Shore Railroad Company was not an innocent purchaser of the steamer Sausalito, for the record shows it purchased during the pendency of the limited liability proceedings, which proceedings disclose the libelant's demands.

The court below allowed the libelant McCue the sum of $1,500 only for the damages sustained by him. The case shows that he lost $400 in money, a suit of clothes estimated by him to be of the value of $50, a watch valued at $20, and that he paid $30 for medical attendance; so that the court below awarded him only $1,000 for his personal injuries. We are of the opinion that such allowance was altogether too low. It is not denied that one of his arms was broken, one of his hands mutilated and partially disabled, and that a part of one of his ears was cut off. He also testified that he was rendered permanently deaf in one ear by reason of the collision, and that he suffered other serious personal injury. Considering all of the facts and circumstances of the case, including the age of the libelant, we are of the opinion that his damages should be, and hereby are, fixed at the aggregate sum of $5,000.

It results from what has been said that in case No. 1,175 the judgment must be and hereby is reversed, and the cause remanded, with directions to the court below to dismiss the petition at the petitioner's cost; case No. 1,176 is remanded, with directions to the court below to so modify the decree therein as to award the libelant McCue damages in the sum of $5,000 and costs, and to strike from the decree the provision that the same may be satisfied upon the payment of any less sum than the full amount so awarded; and case No. 1,177 is remanded, with directions to the court below to so modify the decree therein as to award the libelant Cassidy, as guardian ad litem of the widow and children of Alexander Hall, damages in the sum of $7,500 and costs, apportioned as hereinbefore indicated, and to strike from the decree the provision that the same may be satisfied, upon the payment of any less sum than the full amount so awarded.